**GOTTLIEB & ASSOCIATES**
ATTORNEYS

150 E. 18ᵗʰ St.,  Suite PHR • New York, NY 10003
Tel (212) 228-9795 • Fax (212) 982-6284
NYJG@aol.com

<u>**VIA ECF**</u>                                                                    September 6, 2019

Honorable Edgardo Ramos
United States District Court Judge
Thurgood Marshall
United States District Court Southern District of New York
40 Foley Square
New York, NY 10007

      **Re:**      *Camacho v. Northeastern University,*
                    <u>Civil Action No.: 1:18-cv-10693-ER (S.D.N.Y.)</u>

Dear Judge Ramos:

      This firm represents Plaintiff Jason Camacho and on behalf of all other persons
similarly situated ("Plaintiff") in the above-referenced matter. We respectfully submit the
attached Notice of Supplemental Authority with Exhibit "B" annexed thereto in support of
Opposition to Defendant's Motion to Dismiss that was submitted on June 28, 2019 (Dkt.
27).We thank the Court for its time and consideration.

                                                        Respectfully submitted,

                                        **GOTTLIEB & ASSOCIATES**

                                            <u>*s/.Jeffrey M. Gottlieb*</u>
                                             Jeffrey M. Gottlieb

cc: All counsel of record (via ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JASON CAMACHO AND ON BEHALF OF        :
ALL OTHER PERSONS SIMILARLY           :
SITUATED,                             :          1:18-cv-10693-ER
                                      :
                 Plaintiffs,          :          NOTICE OF SUPPLEMENTAL
                                      :          AUTHORITY
            v.                        :
                                      :
     NORTHEASTERN UNIVERSITY,,        :
                                      :
                                      :
                 Defendant.           :
                                     .:.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## NOTICE OF SUPPLEMENTAL AUTHORITY IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs Jason Camacho and on behalf of all other persons similarly situated

("Plaintiff") respectfully submits this Notice of Supplemental Authority to bring to the

Court's attention a decision issued after the submission of its Opposition to Defendant's

Motion To Dismiss in the above matter on June 28, 2019 (Dkt. 27): *Thurston v. Midvale*

*Corp., No. B291631, 2019 Cal. App. LEXIS 830 (Ct. App. Sep. 3, 2019)* (**Exhibit "B"**). On

appeal from judgment of the Superior Court of Los Angeles County, *Thurston* held there was

not a triable issue as to whether the availability of a telephone number and email address

provided an effective alternative means of communication because the use of either required

a user to depend on another person's convenience to obtain information.

Dated:  September 6, 2019                        Respectfully submitted,

     New York, New York                         GOTTLIEB & ASSOCIATES
                                                *s/Jeffrey M. Gottlieb, Esq.*
                                                Jeffrey M. Gottlieb, Esq.,
                                                150 E. 18th Street, Suite PHR
                                                New York, NY 10003
                                                212-228-9795
                                                NYJG@aol.com
                                                Attorneys for Plaintiffs

# EXHIBIT B

Filed 9/3/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CHERYL THURSTON, | B291631 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BC663214) |
| MIDVALE CORPORATION, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Samantha Jessner, Judge.  Affirmed.

Gordon Rees Scully Mansukhani, Roger M. Mansukhani, Jon C. Yonemitsu, Kara A. Ritter; Greines, Martin, Stein & Richland, Marc J. Poster and Alison M. Turner for Defendant and Appellant.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant.

Pacific Trial Attorneys, Scott J. Ferrell, David W. Reid, Victoria C. Knowles and Richard H. Hikida for Plaintiff and Respondent.

Cheryl Thurston is blind and uses screen reader software (a screen reader) to access the Internet and read website content. She filed this lawsuit after she could not access appellant's restaurant website, www.whisperloungela.com, with her screen reader.  Her complaint alleged appellant violated the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) by violating the federal American with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.).

This appeal asks us to decide whether Title III of the ADA applies to this website, requiring appellant Midvale Corporation to render its restaurant website accessible to blind individuals such as Thurston.  Accessibility would require Midvale to redesign its website so it can be read aloud by screen reader software.  Appellant asks us to adopt the 20-year-old minority position of the United States Court of Appeals for the Third Circuit that the ADA applies to physical barriers to physical places only and to reverse the trial court's imposition of an injunction and statutory damages and grant of summary judgment in favor of Thurston.  We decline to do so.

Appellant raises three other contentions.  First, it argues that even if the ADA applies to websites, summary judgment must be reversed because the statutory damages award and the injunction violate its right to due process.  Appellant next contends summary judgment must be reversed because there is a triable issue of fact as to whether providing a telephone number and email address is an acceptable alternative to a website accessible by screen readers.  Finally, appellant contends the injunction must be dissolved because it is overbroad and uncertain and Thurston lacked standing to claim prospective relief.  The claims invoking due process, standing, and

overbreadth are claims appellant made in its own unsuccessful cross-motion for summary judgment. We agree with the trial court on all issues and affirm the judgment.

BACKGROUND

The facts are straightforward.   Thurston is blind and uses screen reader software to access the Internet.  Among other functions, a screen reader vocalizes invisible code (alternative text) embedded beneath graphics on the website and describes the content of the webpage.  In her complaint, Thurston identified significant barriers when she tried to use appellant's website for its restaurant, The Whisper Lounge:  with her software she could not read the menu or make reservations. In addition, the graphics were either inadequately labelled or not labelled at all, so her screen reader could not discern what information the graphics purported to present. Thurston stated this unsuccessful encounter caused her difficulty, discomfort, and embarrassment.  The website, however, did list a telephone number for The Whisper Lounge.  Thurston was unaware the website listed a telephone number.  Nonetheless, she stated that using the telephone number as an alternative would not have provided her with the same privacy and independence that a fully accessible website offered or that the non-accessible website offered a sighted person.  The website's reservation system was accessible 24 hours per day every day to sighted individuals, but reserving a table by calling the restaurant could only be done during the restaurant's operating hours.

Thurston filed a complaint against the owner of The Whisper Lounge, Midvale Corporation, alleging that the inaccessible website violated the Unruh Act (Civ. Code, § 51 et seq.) which mandates "full and equal accommodations,

3

advantages, facilities, privileges, or services in all business
establishments of every kind whatsoever." (Civ. Code, § 51,
subd. (a).) The Unruh Civil Rights Act also provides that a
"violation of the federal American with Disabilities Act of 1990
[(ADA)] shall also constitute a violation of this section." (Civ.
Code, § 51, subd. (f).) It was under subdivision (f) that Thurston
brought her lawsuit.

The trial court granted summary judgment in Thurston's
favor. The court found Title III of the ADA applied to the
website: "The court finds a plain reading of the statute, as well
as the Department of Justice's treatment of websites under the
ADA, indicate that Defendant's website falls within the category
of 'services, . . . privileges, advantages, or accommodations of' a
restaurant, which is a place of public accommodation under the
ADA. (42 U.S.C. §§ 12181(7)(B); 42 U.S.C. § 12182(a).)"

The trial court found Thurston had proven the website was
inaccessible to blind users: "Plaintiff has provided evidence that
she encountered barriers to Defendant's website which have
prevented her from using its features. (Thurston Decl., ¶¶ 3-7.)
Specifically, Thurston contends she visited the website on
February 20, 2017, and four to five times thereafter, (Thurston
Decl. ¶ 3.) she was unable to read the menu because it was
'offered in an unreadable graphic image' and the link to the pdf
version of the menu resulted in an error message. (Thurston
Decl., ¶¶ 4-5.) Plaintiff also contends that she was unable to
make a reservation or determine whether she could make an
online reservation. (Thurston Decl., ¶ 6.)" The court further
found: "Defendant fails to provide any evidence in Opposition to
refute Plaintiff's showing that the website was inaccessible to
Plaintiff on February 20, 2017."

4

The trial court rejected appellant's claim that there was a triable issue whether its website provided appropriate auxiliary aids.  The court noted appellant provided an email address and a phone number on its website.  The court found "the provision of an email or phone number does not provide full and equal enjoyment of Defendant's website (42 U.S.C. § 12182(a)), but rather imposes a burden on the visually impaired to wait for a response via email or call during business hours rather than have access via Defendant's website as other sighted customers.  Thus, the email and telephone options do not provide effective communication 'in a timely manner' nor do they protect the independence of the visually impaired.  (28 C.F.R. § 36.303(c)(ii).)"

The trial court rejected appellant's contention that it could not be compelled to redesign its website to conform to voluntary Web Content Accessibility Guidelines (WCAG) promulgated by the WorldWide Web Consortium, a nongovernmental consortium. It also rejected appellant's characterization of the complaint as Thurston's attempt to equate a violation of the voluntary guidelines with a violation of the law.  "While Plaintiff addresses the WCAG guidelines, the Complaint does not seek to hold Defendant liable for violating their provisions.  Rather, the Complaint merely references the WCAG guidelines . . . , but does not expressly seek to hold Defendant liable for violating these guidelines.  Rather, the Complaint seeks to prevent Defendant from violating the Unruh [Civil Rights] Act . . . .  Plaintiff has established that Defendant's website was not accessible under the ADA.  Defendant could have, but failed to, adduce evidence that its website was accessible within the standards imposed by

the ADA on February 20, 2017 when Plaintiff accessed the website."

The trial court granted Thurston's motion for summary judgment, and denied appellant's separately filed cross-motion for summary judgment as moot.  The court noted that "Defendant's constitutional arguments in its separate motion are not sufficient to demonstrate that it did not violate the ADA, and therefore we need not reach these issues."  The court also declined to apply the primary jurisdiction doctrine, which permits a court to dismiss a complaint pending resolution of an issue before an administrative agency with special competence.  The court noted it was " 'unknown when, if at all, the [Department of Justice (DOJ)] will issue regulatory standards addressing the ADA's standards governing website access.' "  The court further found "Plaintiff has established standing under the Unruh Act."

DISCUSSION

In an appeal from a grant of summary judgment, we "independently examine the record in order to determine whether triable issues of fact exist to reinstate the action."  (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)  In performing our review, we view the evidence in the light most favorable to the losing party, and resolve any evidentiary doubts or ambiguities in its favor.  (*Ibid.*)

"We will affirm an order granting summary judgment or summary adjudication if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons."  (*Securitas Security Services USA, Inc. v. Superior Court* (2011) 197 Cal.App.4th 115, 120.)

Legal issues are reviewed de novo.  (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 ["Questions of law relate to the selection of a rule; their resolution is reviewed independently."].)  Similarly, constitutional issues are reviewed de novo.  (*State of Ohio v. Barron* (1997) 52 Cal.App.4th 62, 67.)

We review the grant of a permanent injunction for abuse of discretion.  (*Horsford v. Board of Trustees of Cal. State University* (2005) 132 Cal.App.4th 359, 390.)

I.     ***Title III Applies to Appellant's Website.***

Title III of the ADA provides:  "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  (42 U.S.C. § 12182(a).)

Discrimination includes "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."  (42 U.S.C. § 12182(b)(2)(A)(iii).)  DOJ regulations require that a public accommodation "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."  (28 C.F.R. § 36.303(c)(1).) "Auxiliary aids and services" includes "accessible electronic and

information technology" and "other effective methods of making
visually delivered materials available to individuals who are
blind or have low vision."  (28 C.F.R. § 36.303(b)(2).)  A screen
reader is an auxiliary aid.  (*Ibid*.)

It is undisputed that appellant's physical location—the
restaurant—is a place of public accommodation within the
meaning of Title III.  (42 U.S.C. § 12181(7)(B) ["a restaurant, bar,
or other establishment serving food or drink" is a place of public
accommodation].)

In the absence of a controlling United States Supreme
Court or California Supreme Court opinion, we may "make an
independent determination of federal law."  (*Forsyth v. Jones*
(1997) 57 Cal.App.4th 776, 782–783.)  Where the federal circuits
are in conflict, the decisions of the Ninth Circuit are entitled to
no greater weight than those of other circuits.  (*Ibid*.)

Among the United States Circuit Courts of Appeals, there
is essentially a three-way split whether websites qualify as places
of public accommodation within the meaning of Title III.  The
Third Circuit has excluded websites from coverage, holding "[t]he
plain meaning of Title III is that a public accommodation is a
place" and "public accommodation" does not "refer to non-physical
access."  (*Ford v.  Schering-Plough Corp.* (3rd Cir. 1998) 145 F.3d
601, 612, 614 (*Ford*).)

The intermediate position holds that websites are covered
by the ADA only if there is a nexus between the website and
access to a physical place of public accommodation.  (*Robles v.
Domino's Pizza, LLC* (9th Cir. 2019) 913 F.3d 898, 905–906
(*Domino's*).)  The nexus courts explain that discrimination
occurring "offsite" violates the ADA if it prevents disabled
individuals from enjoying services a defendant offers from a

8

physical place of public accommodation.  Variations on the theme
of websites having a nexus to a physical space have been
expressed by the Sixth and Eleventh Circuits.  (*Parker v.
Metropolitan Life Ins. Co.* (6th Cir. 1997) 121 F.3d 1006, 1011 &
fn. 3; *Rendon v. Valleycrest Productions, Ltd.* (11th Cir. 2002)
294 F.3d 1279, 1284–1285 & fn. 8 (*Rendon*).)  Thus, in *Rendon*,
for example, potential contestants for the television show "Who
Wants To Be A Millionaire?" applied to be selected for the show
by using an automated call-in system.  Deaf and mobility-
impaired applicants could not use the call-in system.  The
Eleventh Circuit found the plaintiff had stated a valid claim that
that the inaccessible call-in system deprived the disabled
applicants from enjoying the privilege of being on the show,
which was filmed at a studio located in New York City.  (*Rendon,*
at pp. 1280, 1286.)  In *Domino's*,  the ADA applied to Domino's
website and app, which customers used to order pizza, a product
sold at Domino's physical restaurants.  (*Domino's,* at p. 905–906.)

    The third and most expansive holdings are from the First,
Second, and Seventh Circuits, which have found that a "place of
public accommodation" need not be a physical space and a nexus
to physical space is not required. (*Carparts Distri. Ctr. v.
Automotive Wholesaler's* (1st Cir. 1994) 37 F.3d 12, 19–20; *Doe v.
Mutual of Omaha Ins. Co.* (7th Cir. 1999) 179 F.3d 557, 559
[place of public accommodation encompasses both physical and
electronic space and applies to websites]; *Pallozzi v. Allstate Life
Ins. Co.* (2d Cir. 1999) 198 F.3d 28, 32 [Title III was "meant to
guarantee . . . more than mere physical access."].)

    We have found no controlling authority from the California
Supreme Court.  After oral argument in this case, the Court
decided *White v. Square, Inc.* (August 12, 2019, S249248)

9

___ 5 Cal.5th ___ [2019 Cal. Lexis 5946] (*White*).  *White* did not involve discrimination based on disability or a claim under the ADA; instead, it involved a plaintiff who attempted to use a website that excluded him because of his occupation.  The website was not connected to a brick-and-mortar physical location.  The question presented was whether plaintiff had standing to sue under the Unruh Civil Rights Act when he visited a website with the intent of using its services, encountered terms and conditions that allegedly denied him full and equal access to its services, and then left the website without entering into an agreement with the service providers.  (*White*, *supra*, ___ 5 Cal.5th at p. ___ [2019 Cal. Lexis 5946, pp. *2–*3].)  In finding standing, our Court held that "[i]n general, a person suffers discrimination under the Act when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services.  We conclude that this rule applies to online businesses and that visiting a website with intent to use its services is, for purpose of standing, equivalent to presenting oneself for services at a brick-and-mortar store."  (*Ibid.*)

> A.  *At a Minimum, Title III Covers a Website With a Nexus to a Physical Place of Public Accommodation.*

Appellant urges us to adopt the position of the Third Circuit in *Ford* and hold that Title III applies only to physical places of accommodation and not to non-physical access to the goods or services of a place through off-site means such as websites.  We decline to adopt what is clearly the minority position, and one which has failed to persuade any other federal court of appeal.  We, too, find it unpersuasive.

10

The court in *Ford*, like other courts in the late 1990's, was faced with a claim that Title III applied to the contents of an insurance policy because the policy was a good or service offered by a place of public accommodation (an insurance office).  In this unusual context, the Third Circuit reached the narrow holding that "the provision of disability benefits by [the insurance company] to [plaintiff's employer's] employees does not qualify as a public accommodation."  (*Ford*, *supra*, 145 F.3d at p. 614.)[1]

To buttress this conclusion, the Third Circuit stated the definition of public accommodation was clear and unambiguous, and referred solely to a physical place.  The court expressed its belief that even if the definition were ambiguous, the statute should be interpreted in a manner " 'to avoid the giving of unintended breadth to the Acts of Congress.'  [Citation.]"  (*Ford*, *supra*, 145 F.3d at p. 614.)

We agree with the numerous courts which have found the definition of public accommodation clear and unambiguous, and encompassing more than a physical place.  Title III applies to "services . . . privileges, advantages, or accommodations of" a place of public accommodation.  (42 U.S.C. §12182(a).)  As the Ninth Circuit has pointed out, " 'The statute applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation.  To limit the ADA to discrimination in the provision of services occurring on the

---

[1]     As then-Judge Alito observed in his concurring opinion, the issue of whether Title III covered anything more than physical access had divided the circuits, and it might have been better to "reserve judgment until we are confronted with a case in which the unique considerations of insurance plans are not at stake." (*Ford*, *supra*, 145 F.3d at p. 615.)

premises of a public accommodation would contradict the plain language of the statute.' [Citation.]" (*Domino's, supra,* 913 F.3d at p. 905.)

Even if the Third Circuit's different understanding of the phrase showed ambiguity, we would find unconvincing the court's definition of "place of public accommodation." The Third Circuit's narrow construction of the phrase is unwarranted. The ADA is a remedial statute and as such should be construed broadly to implement its fundamental purpose of eliminating discrimination against individuals with disabilities. (*Hason v. Medical Bd. of California* (9th Cir. 2002) 279 F.3d 1172; see also *Tcherepnin v. Knight* (1967) 389 U.S. 332, 336 [recognizing the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes"].) More specifically, the United States Supreme Court has explained the legislative history of the definition of public accommodation clearly indicates the term should be construed liberally. (*PGA Tour, Inc. v. Martin* (2001) 532 U.S. 661, 676–677.)[2]

Although much has changed between 1990 when Congress passed the ADA, and 1998 when the Third Circuit issued the *Ford* opinion, even more has changed between 1998 and 2019. "[W]eb-based services did not exist when the ADA was passed in 1990." (*National Ass'n of the Deaf v. Netflix, Inc.* (D. Mass. 2012) 869 F.Supp.2d 196, 200.) The United States Supreme Court characterized the growth of the Internet from its inception through 1997 as "extraordinary." (*Reno v. American Civil*

---

[2]     (*PGA Tour, Inc. v. Martin, supra*, 532 U.S. at p. 677, fn. 25, citing S.Rep. No. 101–116, p. 59 (1989); H.R.Rep. No. 101–485, pt. 2, p. 100 (1990).)

*Liberties Union* (1997) 521 U.S. 844, 850.)  In 2018, the U.S. Supreme Court again weighed in on the importance of the Internet, noting that its "prevalence and power have changed the dynamics of the national economy."  (*South Dakota v. Wayfair, Inc.* (2018) 138 S.Ct. 2080, 2097 [also noting that in 1992 less than 2 percent of Americans had Internet access but by 2018 about 89 percent had such access].)

As early as 2001, the Second Circuit noted, "Computer and Internet access have become virtually indispensable in the modern world of communications and information gathering." (*U. S. v. Peterson* (2d Cir. 2001) 248 F.3d 79, 83.) By 2012, courts recognized "business is increasingly conducted online."  (*National Ass'n of the Deaf v. Netflix, Inc.*, *supra*, 869 F.Supp.2d at p. 200.) The Internet today is ubiquitous.  In 2019, for example, Domino's website and app were "two of the primary (and heavily advertised) means of ordering Domino's products."  (*Domino's, supra*, 913 F.3d at p. 905.)

Congress has specifically noted in the ADA's "findings of fact" that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers," the very sorts of discrimination the statute seeks to redress.  (42 U.S.C. § 12101(a)(5); see *Rendon, supra*, 294 F.3d at p. 1286.) Congress intended that the ADA "keep pace with the rapidly changing technology of the times."  (*See* H.R.Rep. No. 101-485, 2d sess, p. 391 (1990).)  "In a society in which business is increasingly conducted online, excluding businesses that sell services through the Internet from the ADA would 'run afoul of the purposes of the ADA and would severely frustrate Congress's intent that

individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public.' " (*National Ass'n of the Deaf v. Netflix, Inc., supra,* 869 F.Supp.2d at p. 200.)  Excluding websites just because they are not built of brick and mortar runs counter to the purpose of the statute.

We hold that including websites connected to a physical place of public accommodation is not only consistent with the plain language of Title III, but it is also consistent with Congress's mandate that the ADA keep pace with changing technology to effectuate the intent of the statute.  The trial court's ruling that the ADA applies to appellant's website is consistent with our holding.

Thurston urges us to go farther and hold that Title III can apply to websites independent of any connection between the website and a physical place, as the First, Second and Seventh Circuits have found.  Here appellant's website provides information and services connected to The Whisper Lounge, a specific restaurant and bar and a physical place to which the public has access.  The website would be just a fictional page on the Internet if it provided menus and other information and services for a restaurant and bar that did not exist.  Accordingly, we need not consider here the wholly hypothetical question whether Title III of the ADA governs a website unconnected to a physical place of public accommodation offering only purely Internet-based services or products.

*B.  The Undisputed Facts Show a Sufficient Nexus Between Appellant's Website and Its Restaurant.*

Appellant contends that even if the ADA applies to a website which has a nexus to a physical location, there is no

14

sufficient nexus here because "a mere association with a public accommodation is not sufficient to establish a nexus between the Website and the restaurant in the circuits ascribing to this theory of public accommodation." Instead, appellant argues the website must be so integrated with the physical place that the website is an extension of the services of the physical location.

In *National Federation of the Blind v. Target Corp.* (N.D. Cal. 2006) 452 F.Supp.2d 946, the district court found Target's website was "heavily integrated with the brick-and-mortar stores and operates in many ways as a gateway to the stores" (*id.* at p. 955) and, through that website, customers could "refill a prescription or order photo prints for pick-up at a store, and print coupons to redeem at a store." (*Id.* at p. 949.) Appellant views these website options as an extension of the services of the physical Target stores, and contends such an extension is required to establish a sufficient nexus. Appellant argues its website is not an extension of the services offered by its dine-in only restaurant because a customer "could not order a meal and have it delivered."

Appellant has taken the quote about integration out of context.[3] Moreover, appellant has not shown that its website is less integrated than Target's. Appellant is not a meal delivery

---

[3]    The court made this statement as part of distinguishing *Stoutenborough v. National Football League, Inc.* (6th Cir. 1995) 59 F.3d 580. The full quote is "Unlike in *Stoutenborough,* where there 'service' was offered by a separate party leasing the public space, the challenged service here is heavily integrated with the brick-and-mortar stores and operates in many ways as a gateway to the stores." (*National Federation of the Blind v. Target Corp.*, *supra*, 452 F.Supp.2d at pp. 954–955.)

service like Domino's Pizza; it is a dine-in restaurant.  We see no significant difference between ordering a refill of a prescription or prints of photos via Target's website and studying the menu and making a reservation for a meal at appellant's restaurant.  In both cases, the customer is simply speeding up his experience at the physical location:  his prescription or photos will be ready when he arrives at Target and his table will be ready when he arrives at the Whisper Lounge.

Appellant argues that "one could not even make a reservation on the Website without leaving it for the website of OpenTable."  The record does not establish the business relationship between appellant's website and www.OpenTable.com.  The only evidence of the relationship between OpenTable and appellant came from the deposition testimony of Christopher Baccus, Senior Vice President of Digital Marketing for appellant's management company.  Baccus was responsible for oversight and management of digital marketing, including the online presence of appellant and appellant's website.  He testified at one point that clicking the reservation button on appellant's website "would open up the restaurant's page on OpenTable."  This description does not support the sort of formal separation appellant implies on appeal, and nothing in Baccus's statement shows that OpenTable could not or would not modify a restaurant's page at the restaurant's request.  He testified only that the "page for OpenTable had already been established before I joined [appellant's restaurant], and there have not been any changes that have needed to be made since I've been there."

More importantly, appellant offers no legal support for its theory that it cannot be liable for ADA discrimination if it hires someone else to do the discrimination.  In the trial court, appellant only cited to section 12182 generally to support this claim.  We note a cursory reading of title 42 of the United States Code section 12182 suggests the opposite. Subsection (b)(1)(A)(i), entitled General Prohibition – Activities–Denial of Participation, provides "It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, *directly, or through contractual, licensing, or other arrangements*, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity."  (Italics added.)

Nevertheless, the *Target* opinion is not the last word on this issue in the Ninth Circuit.  The Ninth Circuit has recently considered the application of the ADA to websites and apps and although it cites *Target* for the general proposition that the ADA is not limited to discrimination occurring on the premises of a place of public accommodation, it does not otherwise incorporate the reasoning of that case.  (*Domino's, supra,* 913 F.3d at p. 905.) The Ninth Circuit stated its nexus requirement very broadly: "We agree with the district court in this case—and the many other district courts that have confronted this issue in similar contexts—that the ADA applies to Domino's website and app, which connect customers to the goods and services of Domino's physical restaurants."  (*Id*. at pp. 905–906, fn. omitted [listing district court cases, including Target].)  That is indisputedly the situation with appellant's website and its restaurant:  the website connects customers to the services of the restaurant.

17

## II.    *Plaintiff's and the Trial Court's References to Nongovermental Guidelines Did Not Violate Appellant's Due Process Rights.*

The Department of Justice has not promulgated regulations specifying technical standards for ADA-compliant websites. However, the World Wide Web Consortium, a nongovernmental consortium, has published voluntary Web Content Accessibility Guidelines (WCAG) to assist interested parties in creating and maintaining websites accessible to individuals with disabilities.  The version in effect when Thurston attempted to use appellant's website was WCAG 2.0.

Appellant contends the trial court "equated" ADA compliance with WCAG 2.0 compliance; based its finding of liability on appellant's non-compliance with WCAG 2.0; and issued an injunction mandating compliance with WCAG 2.0. Appellant argues these rulings violated its constitutional right to due process of law by denying it fair notice of conduct that is forbidden or required.

Appellant acknowledges the trial court expressly found "the Complaint does not seek to hold Defendant liable for violating [WCAG]."  Appellant nevertheless contends  the only reasonable inference from Thurston's statements in her various pleadings is that the trial court determined appellant violated the ADA by violating the WCAG 2.0 guidelines.  Appellant adds "Certainly, the injunction leaves no doubt that the trial court is enforcing those guidelines as if they were the law."

The trial court did not conflate the WCAG 2.0 guidelines with the law. There was no violation of appellant's due process rights.

A.  *The Trial Court Could and Did Disregard Surplus Comments Thurston Made About The WCAG 2.0 Guidelines.*

Although Thurston frequently referred to the WCAG 2.0 guidelines, she always did so in connection with her inaccessibility claims.  Appellant repeatedly omits key phrases of Thurston's statements to make it appear otherwise.  Appellant claims the complaint alleges " '[w]ithout [WCAG 2.0 compliance], a website will be inaccessible to a blind or visually-impaired person using a screen reader.'  (AA 18)"  This statement is taken from the general factual allegations of the complaint; the unedited version reads:  "Without these very basic components, a website will be inaccessible to a blind or visually-impaired person using a screen reader."  These basic "components" are technical elements of a website which permit the screen reader to work; the complaint alleges they are "recommend[ed]" by the WCAG 2.0 Guidelines.[4]  Although Thurston attributes the inaccessibility of appellant's website to its failure to incorporate these components, it is the inaccessibility of the website for which she is seeking redress.

Appellant similarly claims that in Thurston's summary judgment motion she "asked the court to grant her motion because 'Defendant's website . . . violates the WCAG 2.0

---

[4]     For example, one component described in the complaint is alternative text, invisible code that describes a graphical image and enables the screen reader to vocalize the description of the picture a sighted viewer would see.  Thurston's screen reader was unable to provide her with a vocal description of the graphics on appellant's website and Thurston attributed this failure to the lack of alternative text in the website.

Guidelines." As the unedited statement shows, Thurston asked the court to "grant this Motion as Defendant's website is inaccessible and violates the WCAG 2.0 Guidelines." Thurston's primary complaint is that the website is inaccessible.

Appellant's summary of Thurston's expert witness declaration also omits key facts. Appellant claims the expert witness listed purported violations of WCAG 2.0 as evidence of ADA violations. It would be more accurate to say the expert described accessibility issues with appellant's website, and also stated the issues violated WCAG 2.0 guidelines. For example, the expert stated he "found instances of improperly labeled images. This is a violation of WCAG 2.0 1.1.1. Images that are . . . serving as links are not properly labeled with descriptive Alt text, making it impossible for a screen reader user to understand exactly what action the link will perform or to where the screen reader user will be lead." Thus, the violation of the ADA is not the failure to follow a specific guideline, but the inaccessibility that results when a screen reader cannot access and understand an improperly labeled image.

At most, Thurston's statements indicate she was seeking to hold appellant liable on two bases: the inaccessibility of the website and the failure to comply with WCAG 2.0 guidelines. The trial court clearly rejected liability based on non-compliance with the guidelines and premised liability on the website's inaccessibility.

B. *The Specification of WCAG 2.0 Guidelines in the Injunction Does Not Support or Show a Due Process Violation.*

Appellant contends the injunction's mandate to comply with WCAG 2.0 guidelines "implies that [appellant] should have

known such compliance was legally required."  We think the more obvious implication is that the trial court determined appellant could not or would not redesign its website to comply with ADA standards without specific guidance, and so it selected what it believed to be a widely used technical standard to provide the needed guidance.

Relying on *Fortyune v. City of Lomita* (9th Cir. 2014) 766 F.3d 1098, appellant suggests the Ninth Circuit has "noted that due process constrains remedies that [maybe] imposed for lack of access, and cautioned that in crafting a remedy, a court must 'consider carefully' what level of accessibility the defendant should have known was legally required."  To the extent appellant relies on *Fortyune* to show due process prohibited the court from ordering it to comply with WCAG 2.0 guidelines, recent and more specific Ninth Circuit case law belies that reliance.  In *Domino's,* after reviewing the statute and DOJ pronouncements on the statute, the Ninth Circuit made clear that "at least since 1996, Domino's has been on notice that its online offerings must effectively communicate with its disabled customers and facilitate 'full and equal enjoyment' of Domino's goods and services."  (*Domino's*, *supra*, 913 F.3d at p. 907.) The same can be said of appellant and The Whisper Lounge.  A court "can order compliance with WCAG 2.0 as an equitable remedy if, after discovery, the website and app fail to satisfy the ADA." (*Ibid*.)

III.     ***Whether Appellant's Alternate Means of***
         ***Communication Would Be Effective Is Not a Triable***
         ***Issue of Fact.***

Appellant contends summary judgment must be reversed because there is a triable issue of fact whether appellant's provision of a telephone number and email address on its website was a reasonable means of satisfying the "effective communications" mandate of the ADA.  As stated above, DOJ regulations require that a public accommodation "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."  (28 C.F.R. § 36.303(c)(1).)

To create this claim, appellant parses together several different concepts.  First, appellant decides any discrimination in this case should be evaluated under title 42 of the United States Code, section 12182 subdivision (b)(2)(A)(ii), which defines discrimination as "a failure to make reasonable modifications in policies, practices and procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities . . . ."  Appellant leans heavily on the use of the word "reasonable" in this section, arguing that " '[r]easonableness is generally a question of fact to be resolved by a jury.' "  It is not clear, however, that "policies, practices and procedures" were the problem here.

The more directly applicable provision is subdivision (b)(2)(A)(iii), which defines discrimination as "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence

of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." This is also the language upon which the trial court based its grant of summary judgment.[5]  Even assuming there could be a triable issue of fact on whether an individual is treated differently within the meaning of that subdivision, there was no triable issue in this case.  Thurston offered undisputed evidence she was treated differently than sighted users of the website due to the absence of an auxiliary aid or service which made the website readable by screen reader software.  She could not "read" the menu or make reservations instantly and at any time like sighted users could.  At best, she could only email the restaurant and obtain a reply when the restaurant was open, or call the restaurant during business hours.

Appellant argues it could comply with the ADA by providing any type of auxiliary aid or service that ensured effective communication and that there was a triable issue of fact concerning whether the telephone number and email address ensured effective communication.  Appellant points to section 36.303(c)(1)(ii) of title 28 of the Code of Federal Regulation which states:  "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. A public

---

[5]     The trial court attributed the language to 28 C.F.R. § 36.303(a), not the statute.  The language is found in both.

accommodation should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication.  In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability."

Appellant focuses on the first part of title 28 Code of Federal Regulations section, which describes the individualized nature of the determination of what type of auxiliary aid is necessary to ensure effective communication.  It argues that it "necessarily follows that, given this flexibility, a reasonableness standard must govern."  Appellant also focuses on the ability of the place of accommodation to select the type of auxiliary aid it provides.  The last sentence of title 28 of the Code of Federal Regulation section 36.303(c)(1)(iii), however, makes it clear that *all* aids and services "must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability."  It was the lack of these universal requirements upon which the trial court based summary judgment, finding "the email and telephone options do not provide effective communication 'in a timely manner' nor do they protect the independence of the visually impaired.  (28 C.F.R. § 36.303(c)(ii).)"

24

Thurston proposed as an undisputed material fact: "Defendant's telephone number does not provide the same privacy and independence that a fully accessible website offers, not the same hours.  (Thurston Decl., [¶] 8)."  Appellant disputed the fact by arguing Thurston's declaration lacked  foundation, and there was no evidence that the telephone number "would not be answered or otherwise responded to.  [¶] There is also no evidence plaintiff would be required to disclose her disability via phone or email, and she has no foundation for claiming the same as she failed to take advantage of these options available to her."

Appellant cited the Baccus deposition and Thurston's deposition to support this argument.  Baccus was asked about the telephone number: "[D]oes that just go to the restaurant itself?" He replied: "Yes.  There is only, I believe, one phone number for the restaurant."  The restaurant was not open 24 hours a day; this testimony is sufficient to establish that plaintiff could not obtain information from the restaurant 24 hours a day. Similarly, Baccus testified the email address on the website went to the restaurant manager; the manager could not physically be available 24 hours a day.  Appellant did not offer any evidence refuting Thurston's statement that the use of a telephone number or email would deprive her of independence.  The use of either required her to depend upon another person's convenience to obtain information. Thus, there was no triable issue of fact whether appellant's alternatives were timely or whether they protected Thurston's independence.

IV.   ***Plaintiff Has Standing to Obtain an Injunction.***

For the first time on appeal, appellant contends Thurston lacked standing to "claim" prospective relief because she failed to show she would be harmed in the future if the injunction were

not granted.[6]  Appellant has forfeited this claim by failing to support it with appropriate legal citations or argument.  To demonstrate error, an appellant "must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record."  (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286–287.)  "We are not obliged to make other arguments for [appellant]."  (*Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) Assuming the claim were not forfeited and assuming a showing of future harm is required, there is sufficient evidence to show that plaintiff would suffer such harm.

---

[6]     The record does not indicate appellant ever argued Thurston had failed to show a likelihood of future harm.  As an affirmative defense appellant asserted Thurston lacked standing because she did not have a legitimate intent to access its website other than to pursue litigation and lacked standing to visit any areas of the website she did not personally visit prior to filing her complaint.  Appellant then moved for summary judgment on the ground plaintiff lacked standing because she did not show she was denied any right on the basis of her disability.  The trial court rejected that argument and found Thurston had established standing.  The California Supreme Court has now made clear that a person who visit a website with the intent to use its services and encounters conditions that exclude the person from full and equal access to its services has standing under the Unruh Civil Rights Act "with no further requirement that the person enter into an agreement or transaction with the business." (*White*, *supra*, ___ 5 Cal.5th at p. ___ [2019 Cal. Lexis 5946, p. *22].)

26

Appellant argues, without citation to relevant California authority, that standing requirements for injunctions are uniform under California law and require a prospect of future injury. Appellant does not acknowledge or distinguish the substantial body of law to the contrary.  Code of Civil Procedure section 367, for example, expressly provides that an action must "be prosecuted in the name of the real party in interest, except as otherwise provided by statute."  " 'Standing requirements will vary from statute to statute based upon the intent of the Legislature and the purpose for which the particular statute was enacted.' (*Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 Cal.App.3d 1377, 1385, 1387, 1389–1390, 1393 [271 Cal.Rptr. 99] [in a suit under a now modified unfair competition statute, injury was not required, because the then-existing version of the statute expressly gave standing to 'the general public' to sue for relief].)"  (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 1000–1001.)

Appellant has not cited any cases discussing the requirements for an injunction under the Unruh Civil Rights Act and suggests no such case exists.  If that is true, appellant makes no argument for what those requirements should be:  appellant does not discuss the language, legislative intent or purpose of the Unruh Civil Rights Act or Civil Code section 52, which authorizes "any person aggrieved" to seek an injunction.  Appellant does not address our Supreme Court's consistent holding that " 'the Act must be construed liberally in order to carry out its purpose' " or the fact that "[i]n light of its broad preventative and remedial purposes, courts have recognized that '[s]tanding under the Unruh Civil Rights Act is broad.' "  (*White, supra*, __ Cal.5th __, at p. __ [2019 Cal. Lexis 5946, p. *7].)  Appellant's only reference

27

to section 52 takes a short phrase out of context.  Appellant argues that "preventative relief cannot be 'deemed necessary' to ensure [Thurston] is afforded a right of access" to the restaurant. In fact, the language of section 52, subdivision (c)(3) authorizes a complainant to seek preventative relief "as the complainant deems necessary to ensure the full enjoyment of the rights described in this section."[7]  Thus, appellant has failed to demonstrate error.  (*City of Santa Maria v. Adam, supra,* 211 Cal.App.4th at pp. 286–287; *Opdyk v. California Horse Racing Bd., supra,* 34 Cal.App.4th at p. 1830, fn. 4; *In re Marriage of Falcone & Fyke, supra,* 164 Cal.App.4th at p. 830.)

In its reply brief, appellant shifts its emphasis and acknowledges that Thurston has alleged sufficient future harm in her complaint by stating " 'Plaintiff continues to be deterred on a regular basis from accessing Defendant's website.' "  Appellant

---

[7]      Civil Code section 52, subdivision (c), provides in full: "Whenever there is reasonable cause to believe that any person or group of persons is engaged in conduct of resistance to the full enjoyment of any of the rights described in this section, and that conduct is of that nature and is intended to deny the full exercise of those rights, the Attorney General, any district attorney or city attorney, or any person aggrieved by the conduct may bring a civil action in the appropriate court by filing with it a complaint. The complaint shall contain the following:  [¶] (1) The signature of the officer, or, in his or her absence, the individual acting on behalf of the officer, or the signature of the person aggrieved. [¶] (2) The facts pertaining to the conduct. [¶] (3) A request for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the complainant deems necessary to ensure the full enjoyment of the rights described in this section."

concedes Thurston has " 'standing to seek an injunction,' " but appellant claims, "not to obtain one, because plaintiff has not demonstrated, and cannot in light of the affirmative evidence of lack of interest, 'a likelihood [s]he will be harmed in the future if the injunction is not granted.' "  (Italics omitted.)

Assuming for the sake of argument that an injunction under the Unruh Civil Rights Act required some evidence Thurston intended to visit the website in the future, appellant did not claim there was insufficient evidence of such an intent during summary judgment proceedings and did not offer any affirmative evidence of a lack of interest.

The record citation appellant provides on appeal is not evidence of a lack of interest, and moreover was not identified in opposition to Thurston's motion for summary judgment.  The citation is to an undesignated portion of Thurston's deposition, where appellant's counsel asks Thurston if "someone" in her group "express[ed] an interest in going to The Whisper Lounge for the holiday luncheon?" Thurston replied, "No.  I just happened to go through my list and just places I may write down and just see what's out there."  This does not in any way equate to a lack of interest on Thurston's part.  To the contrary, it shows she was interested in the restaurant.

In contrast, the trial court found Thurston's declaration in support of her summary judgment motion showed she tried to access the website numerous times and repeatedly encountered barriers.  Her attempts began before and continued after her lawsuit was filed.  The last attempt shown by the record was a few days before Thurston's deposition in this matter.  Thurston's statements that she visited the website periodically even after the lawsuit began and always encountered barriers to access

track the allegation of her complaint that she "continues to be deterred on a regular basis from accessing Defendant's website." (See *FPI Development, Inc. v. Nakashima* (1991) 231 Cal.App.3d 367, 382 ["the pleadings may be read together with the factual showings in the summary judgment proceeding for purposes of discerning what is in issue" and "the factual submissions of the parties must track" the allegations of the complaint].)  Thus, appellant's claim that Thurston lacks standing fails factually as well as legally.

V.     ***The Injunction Is Not Overbroad or Uncertain.***

Appellant argues the injunction goes "further than absolutely necessary" to provide plaintiff relief because it mandates compliance with WCAG 2.0 guidelines whether they have anything to do with the particular barriers appellant encountered.  Appellant also contends given the nature of the guidelines, it is impossible to determine what exactly constitutes compliance.

Appellant has not cited authority for the proposition that it is required to fix only those barriers which Thurston actually encountered.  Appellant made a variation of this argument in its own motion for summary judgment, which the trial court properly rejected.  (See *Chapman v. Pier 1 Imports (U.S.) Inc.* (9th Cir. 2011) 631 F.3d 939, 944.)  As a practical matter, the first barrier encountered by a user may prevent the user from being able to navigate further and encountering additional barriers. Appellant's theory would require a user to bring a lawsuit for the first barrier encountered, then once that barrier was removed, bring another lawsuit for the next barrier encountered and so on. There is no reason in law or logic to adopt such a theory.

Appellant also argues his expert might not agree with plaintiff's expert as to whether the website meets the WCAG 2.0 guidelines.  Appellant has not cited authority for the novel legal proposition that an injunction is overbroad or vague if in the future the parties involved might disagree about whether the enjoined party has fully complied with the injunction.

Further, although appellant complains generally that a compliance determination will require expert testimony, appellant does not explain how the need for experts is a bar to an injunction.  An expert would be necessary not just for the compliance determination but for the compliance itself.  Trial courts routinely assess expert testimony.

Ultimately what appellant argues is that the trial court should have applied the doctrine of primary jurisdiction and dismissed or stayed the case until the Department of Justice issues technical regulations.  (*See Clark v. Time Warner Cable* (9th Cir. 2008) 523 F.3d 1110, 1114 [discussing primary jurisdiction doctrine].) The trial court rejected this claim and we do as well.  We agree with *Domino's*, the Ninth Circuit's recent rejection of the application of the doctrine to a lawsuit involving a website and app alleged to be inaccessible under the ADA.  The Ninth Circuit explained:  "Our precedent is clear:  '[E]ven when agency expertise would be helpful, a court should not invoke primary jurisdiction when the agency *is aware of but has expressed no interest* in the subject matter of the litigation. Similarly, primary jurisdiction is not required *when a referral to the agency would significantly postpone a ruling* that a court is otherwise competent to make.'  [Citation.]  Both circumstances are present here.  [¶]  First, DOJ is aware of the issue—it issued the ANPRM [Advanced Notice of Proposed Rulemaking] in 2010

31

[citation] and withdrew it in 2017 [citation]. Second, DOJ's withdrawal means that the potential for undue delay is not just likely but inevitable." (*Domino's, supra*, 913 F.3d at p. 910.) Application of the primary jurisdiction doctrine "would 'needlessly delay the resolution of' [plaintiff's] claims and undercut efficiency, 'the "deciding factor" in whether to invoke primary jurisdiction.' " (*Ibid.*)  The Ninth Circuit found resolution of website accessibility issues "well within the court's competence" and noted out that "if the court requires specialized or technical knowledge . . . the parties can submit expert testimony." (*Id.* at p. 911.)

Similarly, we find the trial court's injunction mandating compliance with WCAG 2.0 efficient and well within the court's competence to administer.  The injunction is neither overbroad, uncertain, nor unconstitutional.

DISPOSITION

The judgment is affirmed.  Respondent to recover costs on appeal.

**CERTIFIED FOR PUBLICATION**


STRATTON, J.

We concur:



GRIMES, Acting P. J.



WILEY, J.