**GOTTLIEB & ASSOCIATES**
ATTORNEYS

150 E. 18ᵗʰ St., Suite PHR · New York, NY 10003
Tel (212) 228-9795 · Fax (212) 982-6284
NYJG@aol.com

<u>**VIA ECF**</u>                                                         September 17, 2019

Honorable Edgardo Ramos
United States District Court Judge
Thurgood Marshall
United States District Court Southern District of New York
40 Foley Square
New York, NY 10007

                    **Re:**         *Camacho v. Northeastern University,*
                                    <u>Civil Action No.: 1:18-cv-10693-ER (S.D.N.Y.)</u>

Dear Judge Ramos:

    This firm represents Plaintiff Jason Camacho and on behalf of all other persons similarly situated ("Plaintiff") in the above-referenced matter. We respectfully submit the attached Notice of Supplemental Authority with Exhibit "C" annexed thereto in support of Opposition to Defendant's Motion to Dismiss that was submitted on June 28, 2019 (Dkt. 27).We thank the Court for its time and consideration.

                                                            Respectfully submitted,

                                            **GOTTLIEB & ASSOCIATES**

                                                            <u>*s/.Jeffrey M. Gottlieb*</u>
                                                            Jeffrey M. Gottlieb

cc: All counsel of record (via ECF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
JASON CAMACHO AND ON BEHALF OF      :
ALL OTHER PERSONS SIMILARLY         :
SITUATED,                           :            1:18-cv-10693-ER
                                    :
            Plaintiffs,             :       NOTICE OF SUPPLEMENTAL
                                    :              AUTHORITY
            v.                      :
                                    :
NORTHEASTERN UNIVERSITY,            :
                                    :
                                    :
            Defendant.              :
                                   .:.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## NOTICE OF SUPPLEMENTAL AUTHORITY IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS


Plaintiffs Jason Camacho and on behalf of all other persons similarly situated

("Plaintiff") respectfully submits this Notice of Supplemental Authority to bring to the

Court's attention a decision issued after the submission of its Opposition to Defendant's

Motion To Dismiss in the above matter on June 28, 2019 (Dkt. 27): *Citizens for*

*Responsibility & Ethics in Wash. v. Trump, No. 18-474, 2019 U.S. App. LEXIS 27634, (2d*

*Cir. Sep. 13, 2019), ("CREW") or* ("**Exhibit "C"**). In *CREW*, the Court held the Plaintiff

suffered an injury-in-fact and therefore had Article III standing.


Dated:  September 17, 2019                      Respectfully submitted,
        New York, New York
                                        GOTTLIEB & ASSOCIATES
                                        *s/Jeffrey M. Gottlieb, Esq.*
                                        Jeffrey M. Gottlieb, Esq.,
                                        150 E. 18th Street, Suite PHR
                                        New York, NY 10003
                                        212-228-9795
                                        NYJG@aol.com
                                        Attorneys for Plaintiffs

# EXHIBIT C

18-474-cv
Citizens for Responsibility and Ethics in Washington v. Trump

1    UNITED STATES COURT OF APPEALS
2    FOR THE SECOND CIRCUIT
3
4    August Term, 2018
5
6    (Argued: October 30, 2018        Decided: September 13, 2019)
7
8    Docket No. 18-474
9
10   _____
11
12   Citizens for Responsibility and Ethics in Washington, Restaurant
13   Opportunities Centers United, Inc., Jill Phaneuf, and Eric Goode,
14
15   *Plaintiffs-Appellants*,
16
17   v.
18
19   Donald J. Trump, in his official capacity as
20   President of the United States of America,
21
22   *Defendant-Appellee*.
23
24   _____
25
26   Before:
27
28   JOHN M. WALKER, PIERRE N. LEVAL, CHRISTOPHER F. DRONEY,
29   *Circuit Judges*.
30
31   Plaintiffs, who own and operate businesses in the hospitality industry,
32   appeal from the dismissal of their lawsuit by the United States District Court
33   for the Southern District of New York (George B. Daniels, *J*.). The district
34   court dismissed Plaintiffs' suit on the grounds that Plaintiffs lack Article III
35   standing, they fall outside the zone of interests of the Emoluments Clauses,
36   their claims do not present a ripe case or controversy within the meaning of
37   Article III, and the case presents a non-justiciable "political question."
38   VACATED AND REMANDED.
39
40   Judge WALKER dissents in a separate opinion.

DEEPAK GUPTA, Gupta Wessler PLLC,
Washington, D.C. (Jonathan E. Taylor,
Joshua Matz, and Daniel Townsend,
Gupta Wessler PLLC, Washington, D.C.;
Joseph M. Sellers, Daniel A. Small,
Cohen Milstein Sellers & Toll PLLC,
Washington, D.C.; Norman L. Eisen,
Stuart C. McPhail, Adam J. Rappaport,
Citizens for Responsibility and Ethics in
Washington, Washington, D.C.;
Laurence H. Tribe, Harvard Law School,
Cambridge, MA, on the brief), *for
Plaintiffs-Appellants*.

HASHIM M. MOOPPAN, Department
of Justice, Washington, D.C., (Chad A.
Readler, Michael S. Raab, Megan
Barbero, Department of Justice,
Washington, D.C., on the brief), *for
Defendant-Appellee*.

LEVAL, Circuit Judge:

Plaintiffs—Eric Goode, a restaurateur and hotelier, and Restaurant

Opportunities Center United ("ROC"), a non-partisan, member-based

organization of restaurants and restaurant workers—appeal from the

judgment of the United States District Court for the Southern District of New

York (Daniels, J.) dismissing their complaint against Defendant Donald J.

Trump, the President of the United States, for lack of subject matter

1  jurisdiction. The complaint seeks declaratory and injunctive relief for the

2  President's alleged violations of the Domestic and Foreign Emoluments

3  Clauses of the United States Constitution. The President moved to dismiss for

4  lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure

5  12(b)(1), arguing that Plaintiffs did not have standing to sue. The district court

6  granted the motion, concluding that Plaintiffs lack Article III standing, they

7  fall outside the zone of interests of the Emoluments Clauses, their claims do

8  not present a ripe case or controversy within the meaning of Article III, and

9  their suit is barred by the political question doctrine. For the reasons below,

10  we vacate the judgment and remand for further proceedings.

## A. BACKGROUND

12      Plaintiffs are in the hospitality industry.[1] Plaintiff Goode owns high-

13  end hotels, restaurants, and event spaces in the New York City area. Plaintiff

14  ROC counts among its members over 200 establishments, including high-end

---

[1] In proceedings before the district court, plaintiffs included Jill Phaneuf, who worked in the hospitality industry, and Citizens for Responsibility and Ethics in Washington (CREW), a non-profit government watchdog. In Plaintiffs' appellate briefing, CREW notified the court it is "no longer appealing the district court's judgment" that CREW lacks standing. Additionally, Phaneuf left the job wherein she allegedly competed with Defendant's businesses for diplomatic clientele, and Plaintiffs acknowledge that she "no longer has Article III standing to pursue her claims, which sought only prospective relief."

3

1    restaurants and event spaces in New York City and Washington, D.C. The

2    Plaintiff establishments cater to foreign and domestic government clientele,

3    and allege that they are direct competitors of hospitality properties owned by

4    the President in Washington D.C. and New York City.

5         The complaint alleges that President Trump, operating through

6    corporations, limited-liability companies, limited partnerships, and other

7    business structures, is effectively the sole owner of restaurants, hotels, and

8    event spaces, which are patronized by foreign and domestic government

9    clientele. The President has announced that, since assuming office, he has

10   turned over day-to-day management of his business empire to his children

11   and established a trust to hold his business assets.[2] However, he maintains

12   sole ownership, receives business updates at least quarterly,[3] and has the

13   ability to obtain distributions from the trust at any time.[4] The facts alleged by

14   Plaintiffs, together with those acknowledged by the President, support the

---

[2] *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8.

[3] Jennifer Calfas, *Eric Trump Says He'll Give the President Quarterly Updates on Business Empire*, Fortune (March 24, 2017), http://for.tn/2n2MRXa.

[4] Derek Kravitz & Al Shaw, *Trump Lawyer Confirms President Can Pull Money From His Businesses Whenever He Wants*, ProPublica (April 4, 2017, 5:53 PM), http://bit.ly/2o1OM1C.

4

1    inference that the revenues of the Trump establishments are substantially (or

2    are convertible into) personal revenues of the President.

3         i.    Plaintiffs' Allegations

4         Stated generally, Plaintiffs allege that they have been and will be

5    injured because foreign and domestic government entities that patronize

6    Washington, D.C. and New York hotels, restaurants, and event spaces

7    patronize Trump establishments (in preference to Plaintiffs' establishments)

8    in the hope of enriching the President and earning a reward from him

9    through official Presidential action favorable to their governments, and that

10   such enrichment of the President by foreign and domestic government

11   entities violates the Foreign and Domestic Emoluments Clauses. There are

12   three principal categories of allegations.

13        First, Plaintiffs allege that they directly compete with the President's

14   establishments for foreign, state, and federal government clientele.  Second

15   Amended Complaint (the "Complaint") ¶¶ 13-20. Plaintiffs support this

16   allegation with extensive declarations from hospitality industry experts.[5]

---

[5] Where, as here, a defendant makes a "fact-based" 12(b)(1) motion to dismiss by "proffering evidence beyond the Pleading," the plaintiff may "need to come forward with evidence of

1    Rachel Roginsky, a hospitality consultant and professor at the Boston

2    University School of Hospitality Administration, asserts that certain of

3    Goode's hotels and one ROC member's hotel-restaurant are "[p]rimary

4    competitors" with Trump SoHo and Trump International New York because

5    they "market to and attract customers from essentially the same pool" given

6    their "similar . . . location, facilities, services, amenities, class, image, and

7    price." Roginsky Decl. ¶¶ 14-17. Dr. Christopher Muller, former Dean of the

8    Boston University School of Hospitality Administration, identifies numerous

9    of Plaintiffs' restaurants in the New York and Washington, D.C. areas that he

10   asserts are "comparable" to various Trump establishments because they are

11   within the same market "segment" and therefore directly compete with one

12   another. Muller Decl. ¶¶ 24-29, 50-56, 67-75. Collectively, the two declarations

13   identify more than a dozen of Plaintiffs' establishments, which, according to

14   Roginsky and Muller, compete directly with roughly half a dozen Trump

---

[its] own to controvert that presented by defendant[.]" *Carter v. HealthPort Techs., LLC*, 822
F.3d 47, 57 (2d Cir. 2016) (*citing Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126,
1131 (2d Cir. 1976)). The President's motion to dismiss challenged not only the facial
sufficiency of the complaint, but also the factual assertion that Plaintiffs' restaurants directly
compete with Trump establishments. Thus, we consider not only the allegations in the
complaint but also the expert affidavits submitted in response to Defendant's fact-based
motion to dismiss.

1  establishments over the same customer base, including foreign and domestic

2  government customers. Owners of these establishments also submitted

3  declarations attesting that their restaurants and hotels are frequented by

4  foreign, state, and federal officials and that they compete directly with Trump

5  establishments over this customer base. Goode Decl. ¶¶ 4, 23-24, 34, 36, 47-50;

6  Colicchio Decl. ¶¶ 13-14, 20-21, 28-29. Plaintiffs' declarations include evidence

7  of loss of government patronage from Plaintiffs' establishments after the

8  presidential election. ROC alleges that its restaurant and restaurant-employee

9  members have suffered injury due to "lost business, wages, and tips."

10  Complaint ¶ 13. Specifically, James Mallios, managing partner at ROC-

11  member restaurant Amali, testifies that Amali regularly hosts dinners and

12  events for government officials, including foreign leaders, Mallios Decl. ¶¶ 9,

13  20, 24-27, and that its tax-exempt sales declined after November 2016,

14  reflecting a decline in government business. *Id.* ¶ 28.

15      Second, the Complaint cites statements by the President implicitly

16  soliciting the patronage of government officials and apparently

17  acknowledging that, in making governmental decisions, he favors

18  governments that patronize his businesses. *See, e.g.*, Complaint ¶ 96 ("Trump

1  said [of the Saudis, in the context of discussing trade negotiations], '. . . They

2  spend $40 million, $50 million. Am I supposed to dislike them? I like them

3  very much.'"); *id.* ¶ 52 (responding to a question about the U.S.'s dispute with

4  China over the South China Sea, "I do deals with [China] all the time.

5  [China's largest bank] is a tenant of mine . . ."). The Complaint alleges that

6  Trump businesses began investing in attracting foreign government business

7  after the election, *id.* ¶¶ 60-63, and further that these efforts have succeeded in

8  attracting post-election patronage from foreign governments. *Id.* ¶¶ 64–87.

9         Third, Plaintiffs allege that foreign governments have taken note of,

10  and been influenced by, the message that enriching the President by giving

11  patronage to his establishments earns his favor. Plaintiffs point to statements

12  by foreign government officials quoted in newspaper articles, including one

13  "Middle Eastern diplomat" who said, "Believe me, all the delegations will go

14  [to Trump establishments]." *Id.* ¶ 62 (*quoting* Jonathan O'Connell & Mary

15  Jordan, *For foreign diplomats, Trump hotel is place to be*, WASH. POST (Nov. 18,

16  2016), http://wapo.st/2oPYggX). Another diplomat reportedly stated, "Why

17  wouldn't I stay at his hotel blocks from the White House[?] . . . Isn't it rude to

18  come to his city and say, 'I am staying at your competitor?'" *Id.* Plaintiffs also

8

1    allege that foreign government official patronage of Trump establishments

2    has increased since the President was elected. *Id.* ¶¶ 56, 60, 64, 68, 72, 79, 82.

3    In particular, Plaintiffs point to one instance in which, shortly after the

4    election, a foreign government switched the venue of an event from a

5    competitor to a Trump establishment. *Id.* ¶ 74.

6         The Complaint asserts that the President's receipt of the revenues he

7    derives from the patronage of foreign and domestic government entities

8    violates the Foreign and Domestic Emoluments Clauses. *Id.* ¶ 1. The Foreign

9    Emoluments Clause provides: "[N]o Person holding any Office of Profit or

10   Trust under [the United States], shall, without the Consent of the Congress,

11   accept of any present, Emolument, Office, or Title, of any kind whatever, from

12   any King, Prince, or foreign State." U.S. Const., Art. I, § 9, Cl. 8. Congress has

13   not consented to Defendant's receipt of the emoluments at issue here.

14   Complaint ¶ 2.  The Domestic Emoluments Clause provides: "The President

15   shall, at stated Times, receive for his Services, a Compensation, which shall

16   neither be increased nor diminished during the Period for which he shall

17   have been elected, and he shall not receive within that Period any other

1    Emolument from the United States, or any of them." U.S. Const., Art. II, § 1,

2    Cl. 7.

3         The Complaint seeks both declaratory and injunctive relief. It seeks a

4    declaration, *inter alia*, that, in these circumstances, the patronage of foreign

5    and domestic government entities of the President's establishments violates

6    the Foreign and Domestic Emoluments Clauses. Complaint ¶ 20. As to

7    injunctive relief, the Complaint asks the court to "enjoin[] Defendant from

8    violating both Emoluments Clauses" and to "requir[e] Defendant to release

9    financial records sufficient to confirm that Defendant is not engaging in any

10   further transactions that would violate either Emoluments Clause." *Id*.

11        ii.    Defendant's Motion to Dismiss

12        The President moved to dismiss the Complaint, arguing that Plaintiffs

13   lacked Article III standing and fell outside the zone of interests of the

14   Emoluments Clauses. As to standing, the President argued that Plaintiffs'

15   "allegations of future injuries are premised upon a speculative chain of

16   possibilities, including the decisions of third parties [i.e., prospective

17   government customers] not before the Court." Defendant's Memorandum of

18   Law in Support of the Motion to Dismiss, at 18-19. With respect to the specific

10

1    evidence of lost government patronage, the President argued that the

2    declarations do not "show that the decline was attributable to" government

3    customers choosing Trump establishments, because the decline could have a

4    different cause. Reply Memorandum of Law in Support of the Motion to

5    Dismiss, at 6. The President did not contest the substance of Plaintiffs' expert

6    testimony that certain of Plaintiffs' establishments compete directly with

7    Trump establishments. As to the zone of interests, President Trump argued

8    that because the Clauses were "intended to guard against the corruption of

9    and foreign influence on federal officials and to ensure the independence of

10   the President," Plaintiffs' alleged injuries "bear no relation to the [Clauses']

11   core concerns," and thus Plaintiffs' claims should be dismissed. Defendant's

12   Memorandum of Law in Support of the Motion to Dismiss, at 25-26.

13        iii.    District Court Decision

14        The district court granted the President's motion to dismiss for lack of

15   jurisdiction under Rule 12(b)(1). While recognizing that Plaintiffs' allegations,

16   supported by expert declarations, satisfied the injury prong of the Article III

17   standing inquiry, the district court found "Plaintiffs have failed to properly

18   allege that Defendant's actions *caused* Plaintiffs competitive injury and that

11

1  such an injury is *redressable* by this Court." *CREW et al. v. Trump*, 276 F. Supp.

2  3d 174, 185 (S.D.N.Y. 2017) (emphasis in original). The district court called it

3  "wholly speculative" whether any lost business was "fairly traceable to

4  Defendant's 'incentives' or instead results from government officials'

5  independent desire to patronize Defendant's businesses." *Id.* at 186.

6  Hypothesizing alternative explanations for Plaintiffs' injury, the district court

7  opined that "interest in [Trump] properties" could have "generally increased

8  since he became President" or Plaintiffs may "face a tougher competitive

9  market overall." *Id.* Given that Plaintiffs failed to rule out these alternative

10  explanations for their injury at the pleading stage, the district court concluded

11  the "connection between [] Plaintiffs' alleged injury and Defendant's actions

12  is too tenuous to satisfy Article III's causation requirement." *Id.* For the same

13  reasons, the district court found the injury was not likely to be redressed by

14  any relief the district court could offer. *Id.*

15      The district court also found that Plaintiffs lacked "prudential"

16  standing. Reasoning that standing to sue under the Emoluments Clauses is

17  limited to those parties the Clauses were meant to protect, the district court

18  found that Plaintiffs fell outside the "zone of interests" of the Clauses. *Id.* at

12

187–88. The district court reasoned that "[n]othing in the text or the history of the Emoluments Clauses suggests that the Framers intended these provisions to protect anyone from competition." *Id.* at 187. Rather, the district court found, the Emoluments Clauses are meant to prevent corruption and foreign influence, and ensure the President's independence. *Id.* at 188. Contrasting this suit with one brought under the "generous review provisions of the [Administrative Procedure Act]," the district court stated that the zone of interests test "is *more* strictly applied when a plaintiff is proceeding under a constitutional . . . provision." *Id.* at 187 (emphasis in original) (*quoting Wyoming v. Oklahoma*, 502 U.S. 437, 469 (1992) (Scalia, J., dissenting)).[6] Because Plaintiffs are not vindicating an interest in uncorrupted, independent government, the district court reasoned, they do not have standing to sue under the Emoluments Clauses.

The district court also found that the suit must be dismissed on two additional grounds, neither of which was raised by the Defendant's motion. These were that the case presents a non-justiciable political question and that

---

[6] The district court appeared to mistakenly rely on Justice Scalia's dissent in *Wyoming* as if it were a statement by the majority about the proper application of the zone of interests test. *See infra* n.13.

1    it is not ripe for adjudication. *Id*. at 193–95. Neither of these grounds is

2    defended by the President on this appeal.

3                                   B.  DISCUSSION

4          A suit brought in federal court is "properly dismissed for lack of

5    subject matter jurisdiction under Rule 12(b)(1) when the district court lacks

6    the statutory or constitutional power to adjudicate it." *Makarova v. United*

7    *States*, 201 F.3d 110, 113 (2d Cir. 2000). To the extent that a district court's

8    dismissal for lack of subject matter jurisdiction was based on the application

9    of a rule of law,[7] an appellate court construes the allegations of the complaint

10   in the light most favorable to Plaintiffs and reviews the district court's ruling

11   *de novo*, meaning that our inquiry focuses on whether the rules of law were

12   correctly applied. We conclude that the district court did not apply the law

13   correctly in finding that it lacked jurisdiction to decide the case.

---

[7] In some instances, a district court's dismissal for lack of subject matter jurisdiction under
Rule 12(b)(1) is based in part on factual findings. When such a dismissal is appealed, we
review the relevant factual findings for clear error. *See Rent Stabilization Ass'n of City of New
York v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993).  In this case, although the parties presented
disputed factual issues to the district court by evidentiary submissions, the court did not
purport to resolve disputed issues of fact or make factual findings. Its rulings were based
only on the application of rules of law.  Accordingly, our review is *de novo*. *Id*. ("If the trial
court dismissed on the basis of the complaint alone or the complaint supplemented by
undisputed facts evidenced in the record, our standard is *de novo* review[.]").

14

i.   Article III Standing

Plaintiffs contend that the district court interpreted the law incorrectly

in concluding that they lack standing to bring this action under Article III of

the Constitution. There are three prongs to the standing inquiry under Article

III. In order to successfully allege standing to bring a suit in federal court, a

complaint must plausibly allege the following: *first*, that the plaintiff has

suffered an "injury in fact," which the Supreme Court defines as "an invasion

of a legally protected interest which is (a) concrete and particularized; and (b)

actual or imminent, not [merely] conjectural or hypothetical," *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation

marks omitted); *second*, that there is a "causal connection between the injury

and the conduct complained of," which requires the injury to be "fairly

traceable to the challenged action of the defendant, and not the result of the

independent action of some third party not before the court;" *id.* (internal

quotation marks and alterations omitted); and *third*, that it is "likely, as

opposed to merely speculative, that the injury will be redressed by a

favorable decision." *Id.* (internal quotation marks omitted). These three

components of the Article III "case or controversy" requirement are designed

1 to ensure that the "plaintiff has alleged such a personal stake in the outcome

2 of the controversy as to warrant his invocation of federal court jurisdiction

3 and to justify [the] exercise of the court's remedial powers on his behalf."

4 *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1974) (internal

5 quotation marks omitted).

6  We find that Plaintiffs satisfy all three prongs of Article III standing for

7 the reasons set forth below.

8   *a.* *Injury*

9  The requirement that Plaintiffs adequately allege an *injury in fact*

10 "serves to distinguish a person with a direct stake in the outcome of a

11 litigation—even though small—from a person with a mere interest in the

12 problem." *United States v. Students Challenging Regulatory Agency Procedures*

13 *(SCRAP)*, 412 U.S. 669, 690 n.14 (1973) (*citing, inter alia,* Kenneth C. Davis,

14 *Standing: Taxpayers and Others*, 35 U. Chi. L. Rev. 601, 613 (1968) ("[A]n

15 identifiable trifle is enough for standing to fight out a question of

16 principle.")). Because this appeal arises at the pleading stage, "general factual

17 allegations of injury resulting from the defendant's conduct may suffice, for

18 on a motion to dismiss we presume that general allegations embrace those

1 specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561

2 (internal quotation marks omitted).

3      Plaintiffs' alleged injury meets the well-established Article III threshold

4 for economic competitors who allege that, because of unlawful conduct, their

5 rivals enjoy a competitive advantage in the marketplace. To make an

6 adequate allegation of a competitive injury, plaintiffs must plausibly allege (1)

7 that an illegal act bestows upon their competitors "some competitive

8 advantage," *Fulani v. League of Women Voters Edu. Fund*, 882 F.2d 621, 626 (2d

9 Cir. 1989); and (2) "that [they] personally compete[] in the same arena" as the

10 unlawfully benefited competitor. *In re United States Catholic Conference*, 885

11 F.2d 1020, 1029 (2d Cir. 1989). For standing purposes, it is not necessary to

12 identify specific customers who switched to Plaintiffs' competitors; rather,

13 competitor standing "relies on economic logic to conclude that a plaintiff will

14 likely suffer an injury-in-fact when the [defendant] acts in a way that

15 increases competition or aids the plaintiff's competitors." *Canadian Lumber*

16 *Trade Alliance v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008); *see also*

17 *Cooper* v. *Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 738 (5th Cir. 2016) ("It

18 is a basic law of economics that increased competition leads to actual

1   economic injury.'') (internal quotation marks omitted); *Sherley v. Sebelius,* 610

2   F.3d 69, 72 (D.C. Cir. 2010) ("[I]ncreased competition almost surely injures a

3   seller in one form or another[.]"); *Kerm Inc. v. FCC,* 353 F.3d 57, 60 (D.C. Cir.

4   2004) ("A party seeking to establish standing on this basis must demonstrate

5   that it is a direct and current competitor whose bottom line *may be adversely*

6   *affected* by the challenged [] action.") (emphasis added) (internal quotation

7   marks omitted).

8           The Complaint sufficiently alleges that Plaintiffs compete directly with

9   Trump establishments and that the President's allegedly illegal acts favor

10  Plaintiffs' competitors. Specifically, it alleges that Plaintiffs' establishments

11  are harmed in their competition with Trump establishments because, despite

12  being comparable in other relevant respects, the President's establishments

13  offer government patrons something that Plaintiffs cannot: the opportunity,

14  by enriching the President, to obtain favorable governmental treatment from

15  the President and the Executive branch. It alleges that the marketplace is thus

16  skewed in favor of Trump businesses because of his unlawful receipt of

17  payments from government patrons. The Complaint, supported by expert

18  declarations, alleges that this unlawful market skew has caused Plaintiffs

18

1   economic harm in the form of lost patronage from government entities, and

2   that such harm will continue in the future. For competitor standing, that is

3   sufficient.

4         The President argues that Plaintiffs rely on a "boundless theory of

5   standing" that the Supreme Court has rejected because it would find the

6   Article III injury prong satisfied "*whenever* a competitor benefits from

7   something allegedly unlawful . . . ." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99

8   (2013). He argues that Plaintiffs' theory of injury is over-broad because it

9   would "apply the presumption [of harm to competitors] *whenever* a party acts

10  illegally and thereby distorts competition or the defendant's unlawful

11  conduct confers a benefit on a plaintiff's competitor." Appellee's Br. at 31

12  (emphasis in original) (citing *Already*, 568 U.S. at 99). The Defendant,

13  however, both mischaracterizes Plaintiffs' argument and misses the mark in

14  analogizing the theory of injury in this case to the one the Supreme Court

15  rejected in *Already*.

16        Plaintiffs do not argue that they are injured merely because a

17  competitor benefits; rather, Plaintiffs allege that in competing over the *exact*

18  *same customer base*, Trump establishments secure an unlawful advantage

19

1    because giving patronage to Trump establishments offers, in addition to

2    comparable services, the potential, by enriching the President, of securing his

3    favor in governmental decisions. This unlawful market skew directly affects

4    Plaintiffs' revenue and profits: Every dollar of government patronage drawn

5    to Trump establishments by the hope of currying favor with the President is a

6    lost dollar of revenue that might otherwise have gone to Plaintiffs.

7           These facts have little in common with *Already*. In *Already*, the Supreme

8    Court considered whether Already, LLC could challenge the validity of

9    Nike's "Air Force 1" trademark despite the fact that Nike had issued a

10   covenant that it would refrain from making any claims against Already based

11   on the Air Force 1 trademark, and despite the fact that Already did not plan

12   to sell any product that "would arguably infringe Nike's trademark yet fall

13   outside the scope of the covenant." 568 U.S. at 95. The Court clarified that it

14   was insufficient for standing purposes for Already to claim that any gain to

15   Nike was Already's loss; rather, Already had to show "an injury more

16   particularized and more concrete than the mere assertion that something

17   unlawful benefited [its] competitor." *Id.* Because Already did not face any

18   liability for past conduct arguably infringing the Air Force 1 trademark, and

1    because Already had not plausibly alleged any other way in which the

2    trademark's continued validity injured Already, Already lacked an Article III

3    injury.  Here, by contrast, the nature of the injury from the allegedly unlawful

4    conduct is clear and concrete: The Complaint plainly asserts that the Plaintiff

5    establishments are losing, and will continue to lose, business from

6    government patrons based on the patrons' belief that they can obtain official

7    Presidential favor by spending their money in a manner that enriches the

8    President.

9        We conclude that Plaintiffs have satisfied the Article III requirement of

10   alleging an injury in fact.

11           b.    *Causation*

12       Plaintiffs also adequately allege that their injury is fairly *traceable* to the

13   challenged conduct of the Defendant. To satisfy the "traceability" or

14   "causation" prong of the Article III standing test, allegations must provide

15   more than "unadorned speculation" to "connect their injury to the challenged

16   actions." *Simon*, 426 U.S. at 44–45. This, however, does not require ruling out

17   all possible alternative explanations of a plaintiff's injury. The allegations of

18   fact must plausibly support a "substantial likelihood" that the plaintiff's

21

1    injury was the consequence of the defendant's allegedly unlawful actions

2    (and that prospective relief could mitigate the harm). *Id.* at 45.

3           The district court demanded too much at the pleading stage by

4    requiring allegations that dispel alternative possible explanations for

5    Plaintiffs' injury. The district court identified various alternative theories that

6    *could* explain a decline in Plaintiffs' business: a "general[] increase[]" of

7    "interest in [Trump] properties . . . since he became President," *CREW*, 276 F.

8    Supp. 3d at 186; the possibility that Trump establishments provide better

9    "service, quality, location, price and other factors related to individual

10   preference," *id.*; or "an increase in competition in their respective markets for

11   business from all types of customers[.]" *Id.* The district court found Plaintiffs'

12   pleadings inadequate because they failed to dispel these alternative

13   explanations. In so doing, the district court effectively required plaintiffs to

14   prove, pre-discovery, the facts necessary to win at trial. This was error. *See*

15   *Lujan*, 504 U.S. at 561 (explaining that less is required to support standing at

16   the pleading stage compared to "successive stages of the litigation," when the

17   burden increases). Under the standard applied by the district court, it would

18   be virtually impossible to plead a competitive injury, because a defendant

1    would defeat standing merely by pointing to the possibility that customers'

2    preference for defendant's products or services was attributable to something

3    other than the defendant's illegal conduct.[8]

4          Our precedents, and those of the Supreme Court, make clear that

5    Plaintiffs' allegations are sufficient to plausibly assert a substantial likelihood

6    that their injury is the consequence of the challenged conduct. In *Fulani*, we

7    upheld the standing of a fringe, third-party presidential candidate to

8    challenge the continued grant of tax exemption by the IRS to the League of

9    Women Voters on the ground that the League had engaged in impermissible

10   partisan activities by limiting participation in its televised presidential

11   debates to members of the Republican and Democratic parties. 882 F.2d at

---

[8] We also note that there is no logic to the district court's proposition that, because *some* government patrons might be drawn to Trump establishments by curiosity, this means that *none* of them patronize his establishments in the hope of currying the President's favor by enriching him. In the course of a year, there are thousands of instances in which government representatives patronize hotels and restaurants in New York and Washington. Undoubtedly there are many factors that will influence their selections. The likelihood that some choices of government representatives will be influenced by other factors such as general curiosity in no way undermines Plaintiffs' altogether plausible allegation of a substantial likelihood that, in some significant number of instances, government officials will choose Trump hotels and restaurants in the hope that spending their dollars at Trump establishments will influence the President in their favor in governmental decisions.

1    625. The League's criteria for inclusion required, in addition to membership in

2    one of the two major parties, that a candidate be "significant." *Id.* at 625–26.

3            Fulani alleged that she was a "significant" candidate, who would have

4    been included if not for the requirement of membership in either the

5    Republican or Democratic party. *Id.* at 626. In assessing her Article III

6    standing, this court did not probe her allegation that she was a significant

7    candidate despite its dubious merit. We ruled that she had established Article

8    III standing, notwithstanding the obvious improbability that she would make

9    it into the debates as a "significant" candidate. *Id.* ("For purposes of

10   determining Fulani's standing to challenge whether the League's use of [the

11   party membership] requirement was inconsistent with its section 501(c)(3)

12   status, we accept Fulani's contention that she was a 'significant' candidate in

13   this election . . . ."). To satisfy Article III standing, it was sufficient that she

14   had plausibly alleged that she would have qualified. *See also Schulz v.*

15   *Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (finding that a would-be intervenor had

16   Article III standing to prosecute the appeal, where "[t]he district court's

17   decision *could have* caused [an] injury [to the intervenor], and [the] appeal

24

1  *could have* afforded relief that would have redressed that injury") (emphasis

2  added).

3      The Supreme Court has repeatedly upheld the standing of a plaintiff-

4  competitor who alleges a competitive injury caused by a defendant's

5  unlawful conduct that skewed the market in another competitor's favor,

6  notwithstanding other possible, or even likely, causes for the benefit going to

7  the plaintiff's competition. The Supreme Court has explained that when,

8  among competitors, an allegedly illegal "barrier [] makes it more difficult for

9  members of one group to obtain a benefit than it is for members of another

10  group, a member of the former group seeking to challenge the barrier *need not*

11  *allege that he would have obtained the benefit but for the barrier in order to establish*

12  *standing*." *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City*

13  *of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (emphasis added); *see also id.*

14  (explaining that an economic competitor meets the standing requirement by

15  plausibly alleging "the inability to compete on an equal footing" without

16  needing to allege the loss of any identifiable piece of business); *Regents of*

17  *Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978) (upholding standing, based

18  on loss of chance to compete equally, of white male applicant to program that

1    reserved 16 of 100 spots for minority applicants); *Schulz*, 44 F.3d at 53 (finding

2    that "under the well-established concept of competitors' standing," "the loss

3    of opportunity to compete equally" is sufficient to establish standing)

4    (internal citation and quotation marks omitted).

5        Plaintiffs satisfied this standard. The complaint adequately pleads a

6    competitive injury of lost patronage directly traceable to the fact that the

7    President's allegedly illegal conduct induces government patrons of the

8    hospitality industry in Washington, D.C. and New York City to patronize

9    Trump establishments in preference to Plaintiffs' establishments.

10       The district court found, and President Trump argues on appeal, that

11   this case is analogous to *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26,

12   38 (1974). *See CREW*, 276 F. Supp. 3d at 185–86 ("The Court [in *Simon*] held

13   that [the] alleged injury lacked traceability and redressability because of

14   intervening causal factors . . . . [A]s in *Simon*, it is wholly speculative whether

15   the Hospitality Plaintiffs' loss of business is fairly traceable to Defendant's

16   'incentives[.]'"). In *Simon*, indigent persons and their organizational

17   representatives challenged an IRS revenue ruling that extended favorable tax

18   treatment to non-profit hospitals that offered only emergency room services

26

1    to indigents, rather than offering services to indigents to the extent of the

2    hospital's financial ability, alleging that "by extending tax benefits to such

3    hospitals despite their refusals fully to serve the indigent, the defendants

4    were 'encouraging' the hospitals to deny services." *Simon*, 426 U.S. at 33. This

5    case is not analogous to *Simon*.

6         In *Simon*, the Court questioned whether the modification of the relevant

7    tax rule actually influenced hospital policymaking regarding the scope of

8    services provided to indigent patients, and therefore held that the plaintiffs

9    had failed to establish a causal connection between the challenged IRS Ruling

10   and the denials of service. Central to the Court's analysis was its skepticism

11   that the previous IRS rule (or its modification) had a material, non-speculative

12   effect on any given hospital's decision to offer non-emergency services to

13   indigents, particularly when the "undetermined financial drain" arising from

14   the costs of supplying such services may have outweighed the benefits of

15   favorable tax treatment. *Id.* at 43. It was therefore "just as plausible that the

16   hospitals to which respondents may apply for service would elect to forgo

17   favorable tax treatment to avoid" the costs of providing those services. *Id.* In

18   view of the countervailing cost consideration which potentially offset the

27

1    effects of the tax rules, and the plaintiff's failure to "establish . . . that [the]

2    hospitals are [categorically] dependent upon [charitable] contributions," the

3    Court reasoned that the causal link between the IRS ruling and the hospitals'

4    decisions to deny services to the plaintiffs was little more than "unadorned

5    speculation." *Id.* at 43–44. Accordingly, the Court held that the plaintiffs had

6    failed to establish that reinstatement of the previous rule would result in the

7    change in hospital policy that would cure the plaintiffs' injury. *Id.* at 45–46.

8         Here, by contrast, the Complaint, supported by expert declarations,

9    alleges that Plaintiffs' establishments offer services comparable to those

10   offered at Trump establishments in every relevant respect, save one: Plaintiffs

11   cannot offer government patrons the opportunity to obtain favorable

12   treatment from the President and the Executive branch in governmental

13   decisions. It is eminently plausible that if two establishments provide

14   otherwise comparable services, but one establishment offers an inducement

15   that the other cannot offer, then the inducement will attract at least some

16   patronage that might otherwise have gone to the other establishment. The

17   Complaint contains numerous factual allegations sufficient to support the

18   conclusion that the President's receipt (and invitation) of allegedly illegal

1    emoluments actually influences at least some government customers'

2    purchasing decisions. And unlike in *Simon*, there is no reason to believe that

3    the competitive skew caused by those patrons' desire to gain influence by

4    patronizing the Trump establishments is offset or annulled by some

5    countervailing consideration.  *Simon* thus sheds little light on this case.

6            *c.     Redressability*

7        We likewise find that Plaintiffs have adequately pleaded the

8    redressability of their alleged injury, an issue that is closely related to the

9    question of causation. When the injury alleged is caused by the illegal

10   conduct, in many instances (at least where continuation of the illegal conduct

11   will continue to cause harm), the cessation of the illegal conduct will be likely

12   to at least diminish further instance of the injury. Because Plaintiffs have

13   successfully alleged a plausible likelihood that President Trump's conduct

14   caused their injuries, and the injury is ongoing, it logically follows that relief

15   would redress their injury—at least to some extent, which is all that Article III

16   requires. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A plaintiff] need

17   not show that a favorable decision will relieve his *every* injury.") (emphasis in

18   original); *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007) (finding

29

1    redressability is satisfied where "risk of catastrophic harm" could be

2    "reduced *to some extent* if petitioners received the relief they seek") (emphasis

3    added).

4          The Complaint seeks injunctive relief requiring that the President cease

5    the conduct that allegedly violates the Foreign and Domestic Emoluments

6    Clauses. Plaintiffs have plausibly pleaded that the President's ownership of

7    hospitality businesses that compete with them will induce government

8    patrons of the hospitality industry to favor Trump businesses over those of

9    the Plaintiffs so as to secure favorable governmental action from the President

10    and Executive branch. This plausibly alleges that his cessation of the violation

11    would eliminate the inducement to those patrons to favor his businesses, and

12    would therefore eliminate, or at least diminish, the competitive injury that

13    Plaintiffs suffer. These plausible allegations are sufficient to satisfy Article

14    III's requirement of redressability.

15             *d.*     *The Fourth Circuit's In re Trump Decision and Judge Walker's*
16                      *Dissent*

17          We recognize that our colleague Judge Walker disagrees, and that a

18    panel of the Fourth Circuit has also reached the opposite conclusion in a

1    closely analogous case, *In re Donald J. Trump*, 928 F.3d 360 (4th Cir. 2019).[9]

2    Judge Walker relies on substantially the same arguments as the Fourth Circuit

3    panel in *In re Trump*.  Respectfully, we do not find these arguments

4    persuasive.

5        As a preliminary note, both opinions seem to be influenced by their

6    perception that these lawsuits are politically motivated. Judge Walker asserts

7    that this case is "deeply political" and emphasizes that "President Trump was

8    democratically elected by the American people . . . with his business holdings

9    and brand prominence in full view." *See infra*. The Fourth Circuit expressed

10    skepticism as to "why [the plaintiffs] came to the court for relief in the first

11    place," implying that their motivation was political and that this cast doubt

12    on the federal court's jurisdiction. *In re Trump*, 928 F.3d at 377; *see also infra*

13    (quoting *In re Trump*). While it is certainly possible that these lawsuits are

_____

[9] In that case, the District of Columbia and the State of Maryland brought similar claims against the President, alleging violations of the Foreign and Domestic Emoluments Clauses based on factual allegations almost identical to the allegations in this case. *Compare In re Trump*, 928 F.3d at 365–66 *with CREW*, 276 F. Supp. 3d at 182–83. The plaintiffs there argued that they had Article III standing based, *inter alia*, on their "interests in protecting the economic well-being of their residents, who, as competitors of the President, are injured by decreased business, wages, and tips resulting from economic and commercial activity diverted to the President's businesses," as well as based on their "interests as proprietors of businesses that compete with the President's businesses." *In re Trump*, 928 F.3d at 363 (internal quotation marks omitted).

1    fueled in part by political motivations, we do not understand the significance

2    of that fact. It is true that a political motivation for a lawsuit, standing alone,

3    is insufficient to confer Article III standing. *Cf. Flast v. Cohen*, 392 U.S. 83, 106

4    (1968) (noting that the "federal court[s] [cannot be used] as a forum in which

5    to air [] generalized grievances about the conduct of government"). But while

6    the existence of a political motivation for a lawsuit does not supply standing,

7    nor does it defeat standing. "Standing under Article III . . . [depends on] an

8    injury [that is] concrete, particularized, and actual or imminent; fairly

9    traceable to the challenged action; and redressable by a favorable ruling."

10   *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (citing *Horne v.*

11   *Flores*, 557 U.S. 433, 445 (2009)). Whether a lawsuit has political motivations is

12   irrelevant to these determinative issues.

13                    *1.    Injury-in-Fact*

14          With respect to the "injury-in-fact" requirement, Judge Walker

15   correctly states that to establish an injury through the competitor standing

16   doctrine, a plaintiff must show that she is a "direct competitor" of the

17   defendant and an "actual or imminent increase in competition." *See infra*

18   (citations omitted). As we conclude above, Plaintiffs have clearly met these

1    standards. Judge Walker relies on the Supreme Court's decision in *Already*,

2    568 U.S. 85, as demonstrating that "competing businesses [do not] have

3    standing to challenge [] unlawful action simply by virtue of their status as a

4    direct competitor." *See infra* (citing *In re Trump*, 928 F.3d at 377).

5         We readily acknowledge that proposition, but we do not agree that it

6    controls here.  In their allegations, Plaintiffs go further than simply alleging

7    that they directly compete with the Trump establishments; they plausibly

8    allege precisely how the President's allegedly unlawful conduct harms their

9    ability to attract patrons to their establishments. *See, e.g.,* Complaint ¶ 14 ("As

10   a competitor of restaurants located in Defendant's hotels and other properties

11   . . . ROC United has been injured by these payments due to *lost business . . . .*")

12   (emphasis added); *id.* ¶ 199 ("Officials of foreign states and of the United

13   States and various state and local governments have purchased and will use

14   their government's funds to purchase food and services from one or more

15   restaurants owned by Defendant, instead of from competing restaurants that

16   are members of ROC United."). And as we point out above, *Already* involved

17   very different circumstances; the plaintiffs in that case were unable to

1    plausibly allege that Nike's trademark harmed—or threatened to harm—their

2    business prospects. *See* 568 U.S. at 99.[10]

3        Judge Walker also "question[s] the expansive scope" of the competitor

4    standing doctrine, and worries that our approach would confer standing, for

5    example, on a restaurant whose competitor illegally obtained a bank loan or a

6    large tax refund and used its ill-gotten proceeds to hire a better chef or to

7    lower its prices, thereby exposing the plaintiff–restaurant to increased

8    competition. *See infra.* Those hypotheticals are far beyond the scope of our

9    ruling. A plaintiff who establishes an injury-in-fact by alleging direct

10   competition and an "inability to compete [with the defendant] on an equal

11   footing," *City of Jacksonville*, 508 U.S. at 666, must also establish that such

12   injury is "fairly traceable to the defendant's allegedly unlawful conduct" and

13   "likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737,

14   751 (1984). Here the connection between the alleged violations of law and

---

[10] The Fourth Circuit also criticized the plaintiffs for "rest[ing] on the theory that so long as a plaintiff competes in the same market as a defendant and the defendant enjoys an unlawful advantage, the requirements for Article III standing are met." *In re Trump*, 928 F.3d at 377. The Fourth Circuit rejected that "boundless theory of standing" based on the Supreme Court's holding in *Already*. *See id.* For the reasons expressed above, we do not believe that *Already* precludes Plaintiffs' theory of standing. *See supra.*

1   Plaintiffs' harm is far more direct than in Judge Walker's hypothetical: It is

2   precisely the President's receipt of allegedly illegal emoluments that

3   constitutes Plaintiffs' competitive injury.

4           Lastly, Judge Walker seems to draw a rule that the competitor standing

5   doctrine is limited to "three broad categories of cases"—agency cases, election

6   cases, and unfair competition cases—and that this case "fits into none of

7   [them]." *See infra*. He cites no authority for the proposition that the doctrine is

8   limited to these three categories, and we see no reason why it should be. Even

9   if it were, we note that Plaintiffs' theory of competitive injury in this case is

10  structurally identical to the economic reasoning that often supports standing

11  in the unfair competition context. *Id.* (noting that, in unfair competition cases,

12  standing exists when the parties are "direct competitors" based on a

13  presumption that "[s]ales gained by one are thus likely to come at the other's

14  expense") (quoting *TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 825 (9th

15  Cir. 2011)).

16              *2.    Traceability*

17          With respect to traceability, we agree with Judge Walker that "[u]nder

18  the competitor-standing doctrine, . . . traceability flows readily from a

35

competitive injury" and that "if the violation would necessarily harm the

plaintiff's competitive opportunities, then an unlawful edge to a competitor

logically connects to that violation." *See infra* (citations omitted). But we do

not understand Judge Walker's conclusion that traceability is lacking here

because there are "simply too many variables at play . . . to allow the

plaintiffs to rest solely on the bare assertion that the President's acceptance of

emoluments has caused them competitive injury." *See infra*. The fact that there

are "many different factors [that] influence [government officials'] decision

making" does not foreclose Plaintiffs' plausible theory—supported by clear

factual allegations—that the President's prior statements and his receipt of

allegedly illegal emoluments unduly *influences* some government officials to

patronize his establishments, thereby causing a competitive harm to Plaintiffs.

*Id.* Judge Walker's suggestion that the existence of alternate explanations for

the Plaintiffs' competitive injury defeats traceability would deny Article III

standing to plaintiffs alleging antitrust, unfair competition, or trademark

infringement claims who seek to enjoin conduct that unduly influences

buyers in a marketplace. In each of these categories of cases, there exist

"myriad reasons" why a consumer might favor a defendant's product,

1    including, for example, "service, quality, location, price and other factors

2    related to individual preference." *CREW*, 276 F. Supp. 3d. at 186. But these

3    bona fide competitive reasons do not bar a plaintiff from demanding that a

4    court enjoin illegal conduct that skews the marketplace by inserting an

5    additional unlawful competitive advantage.

6        Similarly, the Fourth Circuit panel found that the *In re Trump* plaintiffs

7    had failed to establish traceability because their "conclusion that government

8    customers are patronizing the [Trump International] Hotel because the Hotel

9    distributes profits or dividends to the President . . . requires speculation into

10   the subjective motives of independent actors who are not before the court."

11   928 F.3d at 375. Such speculation, the court held, "undermin[es] a finding of

12   causation." *Id*.[11] We respectfully disagree. That Plaintiffs' theory of harm

13   results from decisions of third parties does not preclude finding the

14   cognizable link between the challenged action and the alleged harm that

15   Article III requires. *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia,

---

[11] The President makes the same argument on appeal in this case. *See* Appellee's Br. at 15–17 ("[P]laintiffs cannot establish traceability and redressability where the alleged injury-in-fact depends on the decisions of independent third parties whose actions the court can neither predict nor control.").

1   J.) ("It is impossible to maintain, of course, that there is no standing to sue

2   regarding action of a defendant which harms the plaintiff only through the

3   reaction of third parties."); *see also Dep't of Commerce v. New York,* 139 S.Ct.

4   2551, 2566 (2019) (holding that plaintiffs had Article III standing where their

5   "theory of standing . . . relies [] on the predictable effect of Government action

6   on the decisions of third parties") (citing, *inter alia, Block,* 793 F.2d at 1309));

7   *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (warning against "wrongly

8   equat[ing] injury 'fairly traceable' to the defendant with injury as to which the

9   defendant's actions are the very last step in the chain of causation"). Virtually

10  every suit for trademark infringement, unfair competition, or violation of the

11  antitrust laws involves harm that results from the decisions of third-party

12  customers. *See TrafficSchool*, 653 F.3d at 825 (noting that "[i]n a false

13  advertising suit, a plaintiff establishes Article III injury if 'some consumers

14  who bought the defendant['s] product under [a] mistaken belief' fostered by

15  the defendant 'would have otherwise bought the plaintiff['s] product," and

16  that such an injury may be proven by the "probable market behavior" of

17  independent third parties) (quoting *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266

18  F.3d 164, 177 (3d Cir. 2001); *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993)).

1    When the "injury hinges on the reactions of [] third parties [to the

2    challenged conduct]," the plaintiff "need not prove a cause-and-effect

3    relationship with absolute certainty; substantial likelihood of the alleged

4    causality meets the test." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety*

5    *Admin.*, 894 F.3d 95, 104 (2d Cir. 2018). For example, "common sense and

6    basic economics," along with admissions from the third parties in question

7    that the challenged action would "affect [their] business decisions," are

8    generally enough to establish the requisite third-party causation. *Id.* at 105

9    (internal quotation marks and citations omitted).

10    Accordingly, to establish traceability, Plaintiffs need only establish a

11    substantial likelihood that the President's receipt of emoluments—and his

12    statements and actions impliedly soliciting such emoluments, *see, e.g.*,

13    Complaint ¶¶ 52, 96—has some favorable effect on government officials'

14    demand for the Trump establishments (and, by extension, some unfavorable

15    effect on their demand for Plaintiffs' competing properties). Plaintiffs need

16    not prove that *every* government official who chooses a Trump establishment

17    does so to curry favor with the President by enriching him, nor need Plaintiffs

18    prove that a particular government official chose or will choose a Trump

1  establishment for the sole or even the primary reason of earning the

2  President's favor. *Dep't of Commerce*, 139 S.Ct. at 2566 (holding that

3  "traceability is satisfied" when plaintiffs established that the third-party

4  action leading to the alleged harm was "likely attributable *at least in part*" to

5  the challenged action, noting that "Article III requires no more than *de facto*

6  causality") (emphasis added) (internal quotation marks omitted). Plaintiffs

7  need only plausibly allege that the President's receipt of emoluments

8  generates an unlawful competitive advantage for the Trump establishments.

9          The allegations in the Complaint are sufficient to meet this burden.

10  Plaintiffs point to statements by foreign diplomats that they and others in

11  their position have been or will be motivated to choose Trump establishments

12  to earn the President's favor, or to avoid his disfavor. *See, e.g.,* Complaint ¶¶

13  62, 74. Moreover, the President's statements to the effect that he favors

14  governments that spend money at his establishments increase the likelihood

15  that government patrons will choose Trump establishments in the hopes of

16  winning influence. *See, e.g., id.* ¶ 96 (alleging that the President publicly stated

17  that he "very much" likes and "get[s] along great with" foreign officials who

1   do business with him). Without the benefit of discovery, the Plaintiffs need

2   not go further to establish causation for the purposes of Article III.

3                      *3.*    *Redressability*

4         Both Judge Walker's dissent and the Fourth Circuit's *In re Trump*

5   opinion deny that any injunctive relief can be fashioned that would help

6   Plaintiffs' predicament. *See In re Trump*, 928 F.3d at 376; *infra* ("[T]here is no

7   allegation that [the requested relief] would cause diplomatic patrons to book

8   at other establishments."). The Fourth Circuit expressed the view that "even if

9   government officials were patronizing [the President's] Hotel to curry [his]

10   favor, there is no reason to conclude that they would cease doing so were the

11   President enjoined from receiving income from the Hotel . . . [given that] the

12   Hotel would still be publicly associated with the President, would still bear

13   his name, and would still financially benefit members of his family." *In re*

14   *Trump*, 928 F.3d at 376. Accordingly, the Fourth Circuit found that "the

15   likelihood that an injunction . . . would not cause government officials to

16   cease patronizing the Hotel demonstrates a lack of redressability." *Id.*

17         Again, we disagree. Where customers favor a defendant's product or

18   service over that of a plaintiff because of that defendant's violation of law,

1    which is often the case in trademark infringement, unfair competition, or

2    antitrust cases, the mere possibility that customers might continue to favor

3    the defendant's product or service after a court enjoins the violation does not

4    defeat Article III standing. If it did, such claims could never be heard before

5    Article III courts.

6         Plaintiffs' requested remedy need only remove from the equation the

7    *improper* competitive advantage arising from the possibility that, by

8    patronizing Trump establishments, government officials can earn favor from

9    the President. "[C]ommon sense and basic economics" indicate that the

10   elimination of any illegal competitive advantage that motivated government

11   officials to give more business to the Trump establishments will cause at least

12   some to cease to give preference to those businesses, thereby redressing the

13   claimed injury. *Nat. Res. Def. Council*, 894 F.3d at 104.

14        Moreover, the Fourth Circuit's suggestion that, notwithstanding a

15   court's grant of the requested relief, some government officials would likely

16   continue to patronize Trump establishments to curry the President's favor is

17   besides the point. *In re Trump*, 928 F.3d at 376. The Supreme Court made clear

18   in *Mass. v. EPA* that a remedy that "will not by itself reverse" the alleged

1    injury would still satisfy the redressability requirement if it "reduced [that

2    injury] to some extent." 549 U.S. at 525–26 (emphasis omitted); *see also Larson*,

3    456 U.S. at 243 n.15 ("[A plaintiff] need not show that a favorable decision will

4    relieve his *every* injury.").

5         We see no justification for the assertion of Judge Walker and the Fourth

6    Circuit that no injunction can be fashioned that would diminish the plaintiffs'

7    injury. *See In re Trump*, 928 F.3d 376–77; *infra*. Injunctive relief could be

8    fashioned along many different lines that would adequately reduce the

9    incentive for government officials to patronize Trump establishments in the

10   hope of currying favor with the President.[12]

11              4.    *Relevance of the Purpose of the Emoluments Clauses*

---

[12] For example, a court could bar the Trump establishments from selling services to foreign and domestic governments during the President's tenure in office, which would fully redress Plaintiffs' injury. A court could require the President to establish a blind trust or otherwise prevent him from receiving information about government patronage of his establishments, which could indicate to government officials that patronizing those establishments is no longer an effective way to earn Presidential favor. A court could require public disclosure of the President's private business dealings with government officials through the Trump establishments, which may discourage Presidential action that appears to improperly reward such patronage. *Cf. Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (noting the tendency of disclosure requirements to "avoid the appearance of corruption by exposing [information] to the light of publicity").

1    Judge Walker also concludes that the "Emoluments Clauses . . . were

2    never designed to, and nor do they, directly regulate the marketplace or the

3    market player as it functions in the marketplace," and draws the inference

4    that a plaintiff who seeks to enjoin a violation of the Emoluments Clauses

5    cannot establish standing to sue if that plaintiff's injury is competitive in

6    nature. *See infra.* This appears to confuse the question whether the Complaint

7    sufficiently states a cause of action with the question of Article III standing. In

8    *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–28

9    (2014), Justice Scalia's majority opinion clarified that the question "whether [a

10   plaintiff] has a cause of action" is separate and distinct from the issue of

11   whether the case "presents a case or controversy that is properly within

12   federal courts' Article III jurisdiction." Neither this court, nor the Supreme

13   Court (nor any other) has ruled that a competitive injury-in-fact, fairly

14   traceable to the challenged action and likely redressable by the requested

15   relief, fails to confer Article III standing unless the claims are based on a law

16   specifically designed to regulate competition. Consideration of the purposes

17   of the clauses may be relevant to whether the Complaint states an actionable

18   claim, or whether a particular plaintiff is within the law's "zone of interests,"

44

1    *see infra*, but are not relevant to whether the Plaintiffs have met the three

2    elements that form the "irreducible constitutional minimum of standing."

3    *Lujan*, 504 U.S. at 560.

4         We therefore conclude that Plaintiffs have satisfied the Article III

5    requirements of traceability and redressability.

6         ii.    Zone of Interests

7         The district court also erred in dismissing the Complaint on the theory

8    that Plaintiffs' injuries fall outside the "zone of interests" of the Emoluments

9    Clauses.  This is for two reasons. First, the zone of interests test does not, as

10   the district court believed, implicate the court's subject matter jurisdiction.

11   Further, the Supreme Court's precedents make clear that Plaintiffs' injuries

12   are not outside the zone of interests of the Emoluments Clauses.

13        Turning first to the question whether zone of interests is a test of Article

14   III standing, the Supreme Court has recently clarified that it is not. In *Lexmark*

15   *Int'l Inc. v. Static Control Components*, the Supreme Court, while

16   acknowledging that past decisions had characterized the zone of interests test

17   as part of a "'prudential' branch of standing," reconsidered the question and

18   clarified both that the "prudential" label is a misnomer and that the test does

1    not implicate Article III standing. 572 U.S. 118, 126–27 (2014). Rather, the

2    Court explained that the test asks whether the plaintiff "has a cause of action

3    under the [law]" on the basis of the facts alleged. *Id.* at 128. The Court

4    emphasized that the test is not "jurisdictional" because "the absence of a valid

5    . . . cause of action does not implicate subject-matter jurisdiction." *Id.* at 128

6    n.4 (internal quotation marks omitted). In *Bank of America v. City of Miami*, 137

7    S.Ct. 1296 (2017), the Court reaffirmed that the zone of interests test asks

8    whether the complaint states an actionable claim under a statute (and not

9    whether the plaintiff has standing and the court has subject matter

10   jurisdiction). The *City of Miami* majority reiterated that the Article III standing

11   requirements are injury, causation, and redressability, and reinforced

12   *Lexmark*'s essential point that the zone of interests question is "whether the

13   statute grants the plaintiff the cause of action that he asserts." *Id.* at 1302.

14        Accordingly, while it had previously been appropriate to consider

15   whether plaintiffs fall within the zone of interests in deciding whether a

16   plaintiff has standing and the court has subject matter jurisdiction, the

17   Supreme Court has unambiguously rejected that approach. The district court

18   thus misconstrued the nature of the zone of interests doctrine.

1    The district court's analysis erred on the merits as well. Every Supreme

2  Court decision construing the zone of interests test as it pertains to

3  competitors' suits supports the view that Plaintiffs satisfy the zone of interests

4  test. Without exception, the Court has held that a plaintiff who sues to enforce

5  a law that limits the activity of a competitor satisfies the zone of interests test

6  even though the limiting law was not motivated by an intention to protect

7  entities such as plaintiffs from competition. *See Nat'l Credit Union Admin. v.*

8  *First Nat. Bank & Tr. Co.*, 522 U.S. 479, 495–96 (1998) (*NCUA*) ("[Defendants

9  argue] that there is no evidence that Congress . . . was at all concerned with

10  the competitive interests of commercial banks [such as plaintiffs], or indeed at

11  all concerned with competition . . . . The difficulty with this argument is that

12  similar arguments were made unsuccessfully in [every case construing the

13  zone of interests of a statute vis-à-vis a plaintiff competitor]."). After *Lexmark*,

14  consistent with the longstanding view that the test is "not meant to be

15  especially demanding," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), the

16  Court reaffirmed that plaintiffs who allege secondary economic injuries due

17  to conduct that violates a limiting law can satisfy the zone of interests test,

18  notwithstanding that the statute violated was not intended to protect against

47

1   the type of injury suffered by the plaintiffs. *City of Miami*, 137 S.Ct. at 1304–05

2   (finding that a municipality fell within the zone of interests of the Fair

3   Housing Act where it alleges an injury due to discriminatory lending causing

4   an increase in foreclosures, which allegedly cause decreased tax revenues and

5   increased expenditures to remedy blight).

6       The line of cases supporting Plaintiffs' satisfaction of the zone of

7   interests test stretches back to *Ass'n of Data Processing Orgs., Inc. v. Camp*, 397

8   U.S. 150 (1970) (*Data Processing*). In *Data Processing*, plaintiffs were sellers of

9   data-processing services. *Id.* at 151. They sued to set aside a ruling of the

10  Comptroller of the Currency, which allowed national banks to offer data-

11  processing services to other banks and bank customers. *Id.* The complaint,

12  alleging a violation of the Administrative Procedure Act, asserted that the

13  Comptroller's rule inflicted a competitive injury on the plaintiffs by allowing

14  banks to exceed the "legitimate scope of [bank] activities," as dictated by the

15  National Bank Act and § 4 of the Bank Service Corporation Act. *Id.* at 157; *see*

16  *also id.* at 155 ("No bank service corporation may engage in any activity other

17  than the performance of bank services for banks."). The Court did not even

18  consider whether the purpose of the statutory restriction was to protect

48

1    competitors. Despite noting that the statutes did not "in terms protect a

2    specified group" from competition, the Court found the zone of interests test

3    satisfied because "§ 4 arguably brings a competitor within the zone of

4    interests protected by it." *Id.* at 156–57. The Court reasoned that the "general

5    policy [of the statute]" of limiting banks' activities "is apparent" and

6    permitted the claim to proceed because plaintiffs' "[financial] interests are

7    directly affected by a broad or narrow interpretation of the Acts." *Id.* at 157.

8    The Court concluded that plaintiffs were within the zone of interests because

9    a party alleging a financial injury is a "reliable private attorney general to

10   litigate the issues of the public interest . . . ." *Id.* at 154; *see also Arnold Tours,*

11   *Inc. v. Camp*, 400 U.S. 45, 46 (1971) (clarifying that "*Data Processing* . . . did not

12   rely on any legislative history showing that Congress desired to protect data

13   processors" and finding plaintiff travel agencies who competed with banks

14   are "arguably . . . within the zone of interests" of a limiting law despite the

15   fact that Congress had not contemplated protecting their competitive

16   interests) (internal quotation marks omitted).

17       The Court's next major zone of interests case, *Investment Company*

18   *Institute v. Camp*, 401 U.S. 617 (1971) (*ICI*), is especially pertinent because the

1    purpose of the statute involved there was similar in relevant respects to that

2    of the Emoluments Clauses. The plaintiffs were investment companies that

3    sought to enjoin a regulation promulgated by the Comptroller of the

4    Currency which permitted banks to operate mutual funds. *Id.* at 618–19.

5    Plaintiffs argued that the ruling violated § 21 of the Glass-Steagall Act, which

6    made it unlawful "[f]or any person, firm, [or] corporation . . . engaged in the

7    business of issuing . . . securities, to engage at the same time to any extent

8    whatever in the business of receiving deposits." 12 U.S.C. § 378(a). Discussing

9    the purpose of Glass-Steagall, the Court concluded that "Congress [] had in

10   mind . . . [the] hazards that arise when a commercial bank *goes beyond the*

11   *business of acting as fiduciary* or managing agent and enters the investment

12   banking business . . . by establishing an affiliate to hold and sell particular

13   investments." *ICI*, 401 U.S. at 630 (emphasis added). The Court found that

14   Congress's purpose in enacting § 21 was to prevent corruption of the banking

15   function and impairment of the ability of banks to function impartially. *Id.* at

16   630–34; *cf. CREW*, 276 F. Supp. 3d at 187 (describing the purpose of the

17   Emoluments Clauses as protecting uncorrupted, impartial, and independent

18   governance). Notwithstanding that the intention of § 21 was to protect

50

1    systemic integrity and was not even arguably intended to benefit competitors,

2    the Court nonetheless found that the investment company plaintiffs were

3    within its zone of interests. *ICI*, 401 U.S. at 621 ("There can be no real question

4    . . . of the [plaintiff investment companies'] standing in the light of the *Data*

5    *Processing* case."). The dissent argued that plaintiffs fell outside the zone of

6    interests because "the Glass–Steagall Act [did not] evidence *any congressional*

7    *concern for . . . freedom from competition.*" *Id.* at 640 (Harlan, J., dissenting)

8    (emphasis added). The majority of the Court rejected that argument without

9    discussion. *See also Clarke*, 479 U.S. at 399–400 (1987) ("[T]here need be *no*

10   *indication* of congressional purpose to benefit the would-be plaintiff.")

11   (emphasis added).

12        *NCUA* also recognized competitor injury as within the zone of interests

13   of the law that was allegedly violated, notwithstanding that the law was not

14   intended to protect the plaintiffs in their competitor role. 522 U.S. 479. The

15   plaintiffs were banks that challenged a revision in the interpretation of § 109

16   of the Federal Credit Union Act ("FCUA") by its administering agency, the

17   National Credit Union Administration ("NCUA"). *Id.* at 483. Section 109

18   restricted federal credit union membership to "groups" that had a "common

1    bond of occupation or association." 12 U.S.C. § 1759(b). The revision that the

2    plaintiffs challenged extended membership eligibility to groups that lacked a

3    single common bond between all members, if the credit union comprised

4    multiple distinct employer sub-groups within which all members had a

5    common bond. *NCUA*, 522 U.S. at 484. The plaintiffs contended that the

6    NCUA's revised interpretation was contrary to the requirements of the Act.

7    *Id.* at 483. The defendants sought dismissal of the suit on the ground that the

8    competitive injury alleged by the plaintiff banks was outside the zone of

9    interests sought to be protected by Congress in enacting the FCUA. The

10   Supreme Court rejected defendants' argument, explaining that "[a]s

11   competitors of federal credit unions, [the plaintiff banks] certainly have an

12   interest in limiting the markets that federal credit unions can serve, and the

13   NCUA's interpretation has affected that interest by allowing federal credit

14   unions to increase their customer base." *Id.* at 493–94. In response to

15   defendants' argument that the plaintiffs' injuries were outside the FCUA's

16   zone of interests because "banks were simply not in the picture" when the

17   relevant statute was drafted, the Court dismissed it as "irrelevant." *Id.* at 496,

18   499.

1    As stated above, the Supreme Court recently reaffirmed substantially

2  the same position post-*Lexmark*. In *City of Miami*, the Court found that a

3  plaintiff alleging an economic injury due to allegedly unlawful conduct was

4  within the zone of interests of the law that regulated the conduct in question.

5  137 S.Ct. at 1304–05. The City had brought an action against housing lenders,

6  alleging they had violated the Fair Housing Act ("FHA") by issuing risky

7  mortgages on unfavorable terms to minority customers. *Id.* at 1301. The City

8  claimed to have suffered economic injury from lost tax revenue and increased

9  municipal expenses due to higher incidence of mortgage foreclosure and

10  increased demand for services to remedy the resulting urban blight. *Id.* at

11  1302. The district court had dismissed the suit under Rule 12(b)(6) for failure

12  to state a claim on the ground that "the harms alleged, being economic and

13  not discriminatory, fell outside the zone of interests the FHA protects." *Id*.

14  The Supreme Court rejected that position. It ruled that the City's "financial

15  injuries fall within the zone of interests that the FHA protects." *Id.* at 1304.

16  The Supreme Court reasoned that, notwithstanding the absence of any

17  indication that the FHA was intended to protect municipal budgets, it was

18  "highly relevant" that the lenders' conduct allegedly "diminish[ed] the City's

53

1    property-tax revenue and increas[ed] demand for municipal services." *Id*.

2    Thus, consistent with the longstanding view that a plaintiff's economic injury

3    usually makes her a "reliable private attorney general to litigate the issues of

4    the public interest," *Data Processing*, 397 U.S. at 154, the Supreme Court found

5    the City's economic injuries to be within the zone of interests of the FHA. *See*

6    *also Bennett*, 520 U.S. at 161 (finding that plaintiff ranchers who asserted an

7    economic injury from a new water management plan adopted by the

8    Secretary of the Interior fell within the zone of interests of the Endangered

9    Species Act "notwithstanding that the interests they seek to vindicate are

10   *economic rather than environmental*") (emphasis added); *Mova Pharm. Corp. v.*

11   *Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998) ("[The zone of interests] analysis

12   focuses . . . on *those who in practice can be expected to police the interests* that the

13   [law] protects.") (emphasis added).

14         While most cases addressing whether the plaintiff's injury is outside

15   the zone of interests of the law alleged to be violated have concerned the zone

16   of interests of a *statute*, and this suit alleges violations of the *Constitution*, we

17   can see no reason why the reasoning of the precedents reviewed above are

18   not equally applicable here. The one instance in which the Supreme Court has

1    ruled on an argument resembling a zone of interests challenge to a

2    Constitutional provision is consistent with the above precedents and suggests

3    that our Plaintiffs satisfy the test. In *Wyoming v. Oklahoma*, 502 U.S. 437 (1992),

4    Wyoming brought suit against Oklahoma within the original jurisdiction of

5    the Supreme Court, alleging that Oklahoma violated the Dormant Commerce

6    Clause by passing a statute requiring that 10% of the coal used by coal-fired

7    Oklahoma producers of electric power be mined in Oklahoma. Wyoming did

8    not mine or sell coal. *Id.* at 442. The only injury Wyoming claimed as a result

9    of the Oklahoma statue was a diminution in its tax revenues because

10   Wyoming coal producers, which paid taxes to Wyoming, suffered diminution

11   in the volume of coal they sold to Oklahoma producers of electric power. *Id.*

12   at 447–48. Oklahoma sought to have the case dismissed on the ground that

13   the tax loss alleged by Wyoming was too remote from the Dormant

14   Commerce Clause's purposes as well as too insignificant. *See id.* at 448, 455.

15   The Court rejected Oklahoma's arguments and granted summary judgment

16   in favor of Wyoming. *Id.* at 461.

17        The Supreme Court ruled that Wyoming's loss of tax revenue caused

18   by Oklahoma's alleged violation of the Dormant Commerce Clause was a

1  proper basis for Wyoming's suit, notwithstanding that its loss of tax revenue

2  was remote from the purposes of the Dormant Commerce Clause. *See id.* at

3  448–50. The majority did not explicitly discuss the zone of interests test, but in

4  upholding Wyoming's standing, it rejected the argument in Justice Scalia's

5  dissent that Wyoming fell outside the zone of interests.[13] To the extent it

6  considered whether the alleged injury was too remote from the activity

7  proscribed by the Dormant Commerce Clause, it did so as part of its analysis

8  of the injury and causation requirements of Article III. *Id.* at 448–49

9  (concluding that the alleged diminution in revenues was "directly linked" to

10  the allegedly unlawful tax); *see also Bond v. United States*, 564 U.S. 211, 218

11  (2011) (explaining, in holding that an individual prosecuted under federal law

12  has standing to bring a Tenth Amendment claim, that "[i]f . . . the person

13  alleging injury is remote from the zone of interests a [law] protects, whether

14  there is a legal injury at all and whether the particular litigant is one who may

---

[13] Puzzlingly, the district court cited a passage from Justice Scalia's dissenting opinion in *Wyoming* seemingly as though it were the holding of the case and without recognizing that the Court's majority opinion implicitly rejected Justice Scalia's argument. Justice Scalia wrote in his dissent that the test is "*more* strictly applied when a plaintiff is proceeding under a constitutional . . . provision instead of the generous review provisions of the APA." *Wyoming*, 502 U.S. at 469 (Scalia, J., dissenting) (emphasis in original). The majority did not explicitly discuss this argument, but in upholding Wyoming's standing, it evidently rejected Justice Scalia's contention.

1   assert it can involve similar inquiries"); *INS v. Chadha*, 462 U.S. 919, 935–36

2   (1983) (holding that individual may challenge a "legislative veto" on

3   separation-of-powers grounds).

4        Thus, while the district court may be correct that "[n]othing in the text

5   or history of the Emoluments Clauses suggests that the Framers intended

6   these provisions to protect anyone from competition[,]" *CREW*, 276 F. Supp.

7   3d at 187, these precedents make clear that the zone of interests test does not

8   require the plaintiff to be an intended beneficiary of the law in question.

9   Plaintiffs who are injured by the defendant's alleged violation of a limiting

10  law may sue to enforce the limitation under the longstanding zone of interests

11  test the Court has articulated.

12       iii.    "Prudential Considerations"—Political Question and Ripeness

13       Plaintiffs also challenge the district court's dismissal of their Foreign

14  Emoluments Clause claim on two further grounds: (i) that it presents a non-

15  justiciable political question, and (ii) that the issues it raises are not ripe for

16  adjudication. The district court described these as "prudential reasons" for

17  dismissing the claim. *CREW*, 276 F. Supp. 3d at 193–95. These grounds were

18  not argued by the President in his motion to dismiss, and the Department of

57

1    Justice, acting as counsel to the President, does not defend them in this

2    appeal.[14]  We do not find the district court's reasoning persuasive.

3         For both rulings, the district court relied on the fact that the Foreign

4    Emoluments Clause bars the receipt of emoluments "without the Consent of

5    Congress[.]" U.S. Const. art. I, § 9, cl. 8. For its non-justiciability ruling, the

6    court reasoned that, as Congress is "the only political branch with the power

7    to consent to violations of the Foreign Emoluments Clause, Congress is the

8    appropriate body to determine whether, and to what extent, [the President's]

9    conduct unlawfully infringes on that power." *CREW*, 276 F. Supp. 3d at 193.

10   According to the district court's reasoning, the courts can never adjudicate

11   whether the Clause has been violated because a suit alleging such a violation

12   will always present a non-justiciable political question. We respectfully

13   disagree and find Plaintiffs' arguments in rebuttal more persuasive.

14        The prohibition stated in the constitutional text renders the President's

15   receipt of "emoluments" unlawful, unless Congress consents to it. In the

---

[14] Notwithstanding that the President neither sought nor defends these aspects of the district court's ruling, we discuss them because of the obligation of federal courts to consider whether they have subject matter jurisdiction to adjudicate a dispute. *Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994).

1    undisputed absence of Congressional consent, the President has violated this

2    provision of the Constitution, if, as charged by the Complaint, he has

3    accepted what the Constitution describes as "emoluments." The federal

4    courts have the responsibility to resolve "Cases and Controversies" arising

5    under the Constitution and laws of the United States. That responsibility

6    entails finding the facts and interpreting the Constitution and laws. It is not

7    affected by the Constitution's grant of authority to Congress to authorize the

8    President to receive emoluments where Congress has not exercised that

9    authority. The mere possibility that Congress *might* grant consent does not

10   render the dispute non-justiciable. The district court's reasoning treated the

11   Clause's authorization to Congress as if it said, "Congress alone shall have the

12   authority to determine whether the President acts in violation of this Clause."

13   It says nothing like that.

14        Furthermore, while challenges to complaints alleging the

15   unconstitutionality of conduct that the Constitution gives Congress the power

16   to authorize are relatively infrequent, they are not unprecedented. When such

17   challenges have arisen, the federal courts, including the Supreme Court, have

18   adjudicated them.  *See, e.g., C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511

1  U.S. 383 (1994) (Dormant Commerce Clause); *Cuyler v. Adams*, 449 U.S. 433

2  (1981) (Compact Clause).

3      The district court also concluded that the dispute was not ripe for

4  review. It reached that conclusion in reliance on the prospect of future

5  Congressional action and on the reasoning of Justice Powell's concurrence in

6  the Supreme Court's order of dismissal in *Goldwater v. Carter*, 444 U.S. 996

7  (1979).

8      *Goldwater* was a dispute over the Constitution's allocation of

9  governmental power between two of the branches of our federal government.

10  President Carter, in the exercise of his constitutional authority to conduct the

11  foreign relations of the United States, and coincident with his recognition of

12  the People's Republic of China as the "sole government of China," announced

13  an intention to abrogate a mutual defense treaty made in a previous

14  administration with the Taiwanese government of the "Republic of China."

15  *Goldwater v. Carter*, 617 F.2d 697, 700–01 (D.C. Cir. 1979), *vacated by* 444 U.S.

16  996. The Constitution empowers the President to make treaties and requires

17  Senatorial consent before the treaties become effective; however, it says

18  nothing about whether Senatorial consent is required to abrogate a treaty.

1    Individual Members of Congress, who disagreed with President Carter's

2    decision to abrogate the treaty, brought suit for declaratory and injunctive

3    relief, contending that the President lacked authority to abrogate the treaty

4    unilaterally without congressional consent.

5            Four Justices, through Justice Rehnquist's concurrence accompanying

6    an order granting certiorari, vacating the judgment below, and remanding,

7    voted to dismiss the suit on the ground that it raised a non-justiciable political

8    question. *Goldwater*, 444 U.S. at 1002 (Rehnquist, J., concurring). Justice

9    Rehnquist explained his view that the suit was non-justiciable "because it

10   involves the authority of the President in the conduct of our country's foreign

11   relations and the extent to which the Senate or the Congress is authorized to

12   negate the action of the President." *Id*.

13           The main thrust of Justice Powell's concurrence was to disagree with

14   Justice Rehnquist's conclusion that such a dispute over the Constitution's

15   allocation of governmental power is nonjusticiable. *Id.* at 996 (Powell, J.,

16   concurring). Justice Powell pointed to the need for a Supreme Court decision

17   to break an otherwise paralyzing governmental stalemate. *Id.* Nonetheless,

18   Justice Powell agreed with the decision to dismiss the action—not because it

61

1   was nonjusticiable, but rather because it was unripe, as the disputing

2   branches had not yet reached the "impasse" that would justify their resorting

3   to the courts to interpret the Constitution and break the stalemate. He

4   emphasized the importance of not "encourag[ing] small groups or even

5   individual Members of Congress to seek judicial resolution of issues before

6   the normal political process has the opportunity to resolve the conflict." *Id*.

7       The differences between this case and *Goldwater* are such that *Goldwater*

8   does not provide useful guidance for resolving this dispute. The *Goldwater*

9   litigation arose from a dispute over the allocation of Constitutional powers to

10  two competing branches of government. The Congressional plaintiffs took the

11  position that, by unilaterally abrogating a treaty, which had become effective

12  by virtue of the Senate's exercise of consent, the President was acting illegally

13  and in so doing, was undermining the Constitutional authority of the Senate.

14  This interbranch clash in claims of governmental authority seemed to Justice

15  Powell to offer a likelihood of ripening into either a political resolution or a

16  need for adjudication to break a governmental impasse. The circumstances of

17  this case are very different. There is no interbranch clash in claims of

1    Constitutional authority in this case.[15] The Presidential conduct that is

2    challenged by this suit is the President's private conduct. There is no claim on

3    the part of the Congress, or any of its members, that the President's private

4    conduct of his business affairs usurps power allocated to Congress by the

5    Constitution. While the Constitution empowers Congress to legitimize a

6    President's otherwise unlawful conduct, the President's conduct absent

7    Congressional authorization does not usurp or challenge a Congressional

8    prerogative. In fact, it is not members of Congress who are complaining. In

9    this circumstance, in which Congress's defense of its Constitutional power is

10   not at issue, there is no reason to expect or await either the impasse or the

11   political resolution that Justice Powell saw as the justification for waiting in

12   *Goldwater*. If the challenged conduct falls within what the Constitution

13   describes as the receipt of "emoluments," the conduct is prohibited by the

14   Constitution in the absence of congressional consent—and unlike in

15   *Goldwater*, it is likely simply to continue to occur without a court ruling. This

16   would not be as the result of a "political resolution," but simply because of

---

[15] Members of Congress have brought a separate action against President Trump, alleging violations of the Foreign Emoluments Clause, which is currently pending. *Blumenthal v. Trump*, 382 F. Supp. 3d 77 (D.D.C. 2019).

1    the absence of an adjudicator to tell the President whether his conduct is, or is

2    not, permitted by the Constitution he serves.

3          We therefore think the district court misconstrued Justice Powell's

4    *Goldwater* concurrence in believing that it provided "particularly instructive"

5    guidelines for the resolution of this case. *CREW*, 276 F. Supp. 3d at 194. Justice

6    Powell's reasoning does not justify deferring adjudication to await a ripening

7    that will not happen.

8                          C. CONCLUSION

9          For the foregoing reasons, the judgment of the district court is

10    VACATED and the case is REMANDED for further proceedings consistent

11    with this opinion.